## UNION PAC. RY. CO. v. NOVAK.

(Circuit Court of Appeals, Ninth Circuit. April 2, 1894.)

No. 114.

1. SERVICE OF PROCESS—IRREGULARITIES.

A marshal returned that he had made personal service on the agent of a foreign corporation, but he had in fact left the summons with a person in charge of the agent's office, who handed it to the agent on the following day. On the latter day the agent verbally admitted service, in a conversation with the marshal. *Held*, that the service, though irregular, was not illegal, and should not be set aside on motion.

2. SERVICE ON AGENT OF CORPORATION—AFFIDAVIT AS TO AGENCY.

A person served as ticket agent of a railroad company made affidavit that he was not an agent of the railroad company, but was an agent of a union-depot company, and, as such, sold such tickets as the depot company furnished him. *Held*, that the reasonable inference was that, if the depot company gave him tickets of the railroad company, he would sell them; and, in the absence of a clearer statement of his position and duties, it was not error to hold that he was a ticket agent of the railroad company, upon whom service might be made.

3. EXPERT EVIDENCE—WHEN ADMISSIBLE—QUALIFICATION OF EXPERT.

The question whether one brakeman was sufficient to check or control by hand brakes, only, the speed of a gravel train, consisting of a number

of cars, is a proper subject for expert evidence; and a witness' qualification to testify in regard thereto is prima facie established by evidence that he is an engineer by profession, and that for some time he was a conductor having charge of a similar gravel train.

**4. SAME—PHYSICIANS—STATEMENTS OF PATIENT.**

A physician testifying as to the extent of personal injuries may state what the patient said in describing his bodily condition, including the action or nonaction of internal organs, especially when the physician further testifies that he knew what the trouble was from symptoms disclosed by a bodily examination.

**5. MASTER AND SERVANT—NEGLIGENCE—DEFECTIVE APPLIANCES.**

A fireman on the locomotive of a gravel train was injured by reason of his train getting beyond control on a down grade, and colliding with another train. There was evidence that the automatic braking mechanism was defective and out of order, and that the single brakeman on the train was insufficient to control it by the hand brakes alone. *Held*, that it was proper to leave to the jury the question whether the proximate cause of the injury was the carelessness of plaintiff or his coservants, or the negligence of defendant in failing to provide proper brakes and appliances, and sufficient help.

**6. TRIAL—INSTRUCTIONS.**

An instruction given in answer to a question by a juror, and which does not contain all the qualifications which should be attached to the principle stated, does not constitute reversible error, when, in view of previous and subsequent explicit instructions, it is clear that the jury, as sensible men, could not have been misled by it.

**7. CONTRIBUTORY NEGLIGENCE—BURDEN AND CHARACTER OF PROOF.**

In the federal courts, and in the courts of the state of Washington, the burden of proving contributory negligence rests upon defendant, but it is not necessary that the evidence thereof shall be direct and positive; and, if the proximate cause of the injury is attributable to plaintiff's negligence, this is fatal to a recovery, whether the fact appears by inference from facts shown by evidence for plaintiff, or by direct evidence for defendant.

**8. TRIAL—INSTRUCTIONS.**

It is always within the discretion of the court to give its instructions in its own language, and, if the instructions so given correctly embody all the principles of law applicable to the case, there is no error in refusing requested instructions which are also correct and applicable.

In Error to the Circuit Court of the United States for the District of Washington.

This is an action brought by George J. Novak, defendant in error, but herein designated as plaintiff, to recover damages against the Union Pacific Railway, plaintiff in error, hereafter designated as defendant, for injuries received by him on the 21st of July, 1890. The complaint, with reference to the negligence of the defendant, and the injuries received by plaintiff, alleges that on July 21, 1890, while plaintiff was in the employ of defendant as a fireman upon one of its engines, hauling a long train of cars from a point east of Rockford, the engineer in charge of the locomotive lost control of said locomotive and said train of cars, "by reason of the negligence of defendant and the defective machinery, as hereinafter complained of, and that said locomotive and train of cars, at a great rate of speed, ran into a large number of cars standing on the main line of said railway at said town of Rockford, striking them with great force, and greatly damaging and breaking both said cars and said locomotive, and compelling plaintiff to jump from off said locomotive just as it came in contact with said cars, by reason whereof he was thrown down with great force and violence, and his left leg broken in four places, his arm and shoulder dislocated, and otherwise permanently injured internally, as to cause, among other things, paralysis of the bowels, whereby he is now, and will always remain, unable and unfit for labor or work of any kind whereby he can earn a livelihood, and will be

a cripple and disabled for life;" that the injuries he received were caused solely by the negligence of the defendant; "that the air cylinder and air-brake appliances upon said locomotive, and the tank attached thereto, provided for the purpose of controlling the brakes on said locomotive, tank, and the cars in said train, were out of repair, and would not work; that the shoes were also off and displaced from the steam brake attached to said locomotive, by reason of which said steam brake would not work, and could not be used to check the speed of said locomotive; that plaintiff was not an engineer, and had been but a short time engaged in working on and about locomotives, and firing same, and was unacquainted with the use and necessity of having said appliances so as to aid in checking the speed of a train, and was unacquainted with, and unconscious of, the danger to accident from want of said appliances, and of operating, or attempting to operate, a train without said appliances," and had never been informed or instructed thereabout by defendant; that said defendant negligently failed to provide said train with a conductor, and only provided one brakeman therefor, who would be, and was, wholly unable to check or control the speed of said train by means of the hand brakes upon said cars, without the aid of the air brake aforesaid.

The answer of the defendant specifically denies all the allegations of negligence alleged in the complaint, and affirmatively avers that, owing to the negligence and carelessness of plaintiff and his fellow servants, the train was allowed to run down the grade into Rockford at an excessive rate of speed, instead of being kept under control while approaching Rockford station, and prepared to stop in order to avoid other trains.

The facts material to the issues raised by the assignment of errors, not otherwise specifically stated in the opinion, are that at the time of the accident the plaintiff was 19 years of age; that he had been in the employ of the defendant for 11 months prior thereto as wiper of the engines in one of defendant's roundhouses, and was placed upon the locomotive engine No. 87, as fireman, about 16 days prior to the accident; that prior to that time he had made two or three trips as extra fireman; that the tank belonging to engine No. 87 was equipped with air brakes, but before the day of the accident this tank had been taken off, and another tank, without air brakes, was then being used; that this tank had only a hand brake upon it; that the steam brake on the engine was defective; that 2 out of 12 shoes were worn or missing, which reduced the braking power of the steam brake about one-third less than when all the shoes were in place; that the water brake upon the engine was not in working condition; that when the train started from Spokane there were five employes of defendant upon it, viz. Crowley (the conductor), Sissler (a brakeman), a man known as the "Swede" (a brakeman), Hill (the engineer), and plaintiff (the fireman); that, when the train reached Rockford, Crowley and the Swede got off, and remained at that station; that at that time the train consisted of 18 flat cars loaded with gravel, 10 of which were then unloaded, and 8 cars were left upon the main track, adjoining the west end of the depot platform; that Sissler, who was a brakeman, was put in charge of the train, and, with the engineer and fireman, returned to Freeman with the train, under instructions to take the 10 cars to Conductor McPherson, at Freeman, and then to couple onto the loads of gravel at the side track, and the loads which had been brought up the grade, and bring them to Rockford,—"to let them come, and that the main line would be clear;" that at Freeman the parties took the loads, as per instructions, and started to return to Rockford with 24 flat cars loaded with gravel; that the distance from Freeman to Rockford is about 8 miles, with a down grade; that the grade commences about one-fourth of a mile west of Freeman, at which point it is about 90 feet to the mile, and decreases, going into Rockford, to 53 feet to the mile; that about one mile from Freeman, after entering the down grade, and while running within the limit of 20 miles an hour, as allowed by the rules of defendant, the engineer called for brakes three times; that the second time he called for brakes he applied his steam brake, and set the tank brake; that the train then became beyond the control of the men, and ran away.

The plaintiff, among other things, testified as follows: "When we left Freeman, I presume about a mile and a half or so, the engineer whistled for

brakes. I seen the man who had charge of the train, and who was on the hind car, but I didn't see him make any attempt to set the brakes at that time. The engineer whistled for brakes again. I then seen the brakeman working on a brake, setting it. The engineer whistled for brakes again, and the brakeman stuck up his hand. * * * He whistled for brakes again, but we were going at a faster rate of speed then. The engineer then tried to set his steam brake, and he says: 'There is no use. Everything is gone. The steam brake is out of order, and we can't hold it.' I went and tried to set the tank brake, and that didn't work. So the engineer, he gets off the seat, and he tries to set it, and it did not work, so he told me * * *. He said, 'Get on the seat box, and look out for danger.' We kept whistling all the way down the hill, to warn the men ballasting the track where the gravel was. We came about two hundred yards of Rockford, and we seen Crowley trying to flag us. We were going then, I presume, at the rate of sixty miles an hour, if not more. Before we came to Rockford, there is a big curve going into Rockford; and we could not see them until we came around the curve, because there was a big pile of cord wood, about twelve or fifteen feet high, obstructing the view. So, when we came around the curve, we saw those cars on the main line; and we thought we were in danger, and I got ready to jump off. I jumped about thirty feet, I think, from the end of the platform, and I struck the ground; and it just rolled me like a bunch of rags, and I struck the platform. It threw me up into the air, and threw me on top of the platform, about eight feet from the end of it."

In reply to questions, he answered as follows: "Q. Did you hear John Crowley say anything that day about the direction of this train; generally, about the operation of these gravel trains hauling gravel between these points? A. Well, he came up to the engine, and he says to the engineer, 'They have pulled off one of my crews;' and he says, 'Mr. Sissler will take charge of this train.' Q. What running orders, if any, on that occasion, did you hear Mr. Sissler give, after that time, for the running of this train? A. He says: 'I got orders from Crowley for us to take these empties to Freeman; and engine 42 is there with loads, waiting for us. We will give them our empties, and take their loads, and also the loads on the side track.' And he says: 'Let them come. He will have the main track clear for us, and make the upper switch.'" In the course of his testimony, he gave an account of the injuries he received, which was substantially as alleged in the complaint.

Hill, the engineer, with reference to the accident, testified as follows: "My instructions from Crowley and Sissler were to take these ten cars to Freeman, and turn the empties over to Conductor McPherson. * * * I was to couple onto loads on the side track, and the loads which had been brought up that grade, and bring them to Rockford, and let them come, and he would have the main line clear. * * * After leaving Freeman, we pitched over the summit, and got perhaps a mile down the grade, and I whistled for brakes from Sissler. He was the only man there at the time, and I called for brakes, and he put up his hand in such a manner [indicating]; and I called three times for brakes, altogether. When he stuck up his hand, he was sitting on the brake mast on the last car; and whether he set any more brakes, of course, I cannot say, because, with the ballast train coming along at that speed, would naturally obstruct the view by the dust. I was about a mile and a half from Rockford when I called for brakes the last time. I was about three miles from Rockford when I saw Sissler for the last time. * * * When I came down to the curve, I saw Mr. Crowley with both hands up. I knew at once there was something wrong. I had an idea that the track was not clear, but I was coming down there at such speed that it struck me then, if I reversed my engine, we would all go in a heap there, so I didn't reverse my engine. I had my driver brakes set, and also the hand brake on the tank. I didn't see the engine strike the cars. I jumped off on the platform. After I called for brakes the second time, I started then to put on the tank brake, and I had my driver brake set. The driver brake is the only brake, with the exception of the water brake, on the engine. The engine had an air pump, but no air cylinder on the tank. Of course, we didn't use the air brake. There was a water brake, but it wasn't in working con-

dition. I had been running over the road before. Crowley had control of the four trains running at this point. Sissler was in charge of the train that day."

With reference to the condition of the engine and cars, this witness testified as follows: "I noticed that some of the brakes on the cars looked pretty bad like,—without shoes, and such like. I noticed several times that some of these cars had no brakes. Some would have a brake rod off, and some a brake shoe. I think there were about half dozen. I don't think there were any air brakes on any of the flat cars at all. On my engine the left brake shoe was gone, and another was broken in two. It left us without any considerable power, and the brake rods were not very well equalized. I could apply the brake, but the holding power of the brakes, as compared with the brakes when their shoes were in good condition, was about one-third less. I reported the engine to the master mechanic on Friday evening, and the accident occurred on Monday. I made this report by telegram. I didn't receive any answer. Neither the master mechanic, nor any one else in charge of the repairs, made any reply, or said anything to me verbally about the engine."

The defendant claimed, and its testimony tended to show, that the injury was caused by the negligence of the engineer and the brakeman, in their failure to use ordinary care to prevent the train from getting beyond their control, and also claimed, among other things, that the fireman knew, or ought to have known, of the defects in the braking power of the train of cars, and that he assumed the risks created thereby. The jury found a verdict in favor of the plaintiff, and assessed the damages at $12,000.

W. W. Cotton and Zera Snow, for plaintiff in error.

Jesse Arthur, S. C. Hyde, W. S. Glass, and J. J. Regan, for defendant in error.

Before GILBERT, Circuit Judge, and KNOWLES and HAWLEY, District Judges.

HAWLEY, District Judge (after stating the facts as above).  1. It is argued that the court erred in overruling defendant's motion to set aside the service of summons, upon the ground that the same was not served upon the defendant. The marshal made return that he served the summons "on the 7th day of August, 1891, on said defendant, \* \* \* by delivering to and leaving with Perry Griffin, agent of said defendant at the city of Spokane, \* \* \* in said district, a certified copy thereof, together with a copy of the complaint, certified to by the clerk."

This return, upon its face, shows a sufficient service. But, in support of the motion to have the service set aside, two affidavits were presented: One by Perry Griffin, to the effect that, at the time the service was stated in the return to have been made, he was sick, and was not at his place of business; "that he was not personally served with said summons, nor was he notified of service of same until the day after its pretended service; that he is not an officer or agent of the Union Pacific Railroad Company, but is agent of the Union Depot Company, of Spokane Falls, and, as such agent, sells such tickets as said Union Depot Company furnish him for sale." The other by George Lang, which, after stating that he is in the employ of Perry Griffin, and that no personal service was made upon Griffin, says "that said marshal came into the office of the said Perry Griffin, and left the papers on the counter, and this affiant picked them up and examined them; and when the

v.61F.no.6—37

said Perry Griffin was able to attend to his duties, and in his place of business, * * * this affiant handed said copy of complaint and summons to said Perry Griffin, who refused to accept the same."

The plaintiff presented, in reply thereto, the affidavit of C. H. Chamberlain, who was the deputy United States marshal who made the service, who said:

"On the 7th day of August, 1891, I went to the office of Perry Griffin, in the city of Spokane, * * * for the purpose of serving him with said summons, as an agent of said defendant. Said Griffin was at the time absent from his office, and I left said summons with the person in charge of said office for delivery to said Griffin. Afterwards, to wit, the 8th day of August, 1891, I met said Griffin on one of the streets of said city, and asked him if he had received said summons. He said that he saw it in one of the drawers in his office. I then asked him if he would admit service of said summons; that I had made return on said summons as having served him therewith, and that I didn't want any fooling about it; that, if he did not admit service thereof, that I would serve it again upon him personally, but if he would admit service I would not serve him again. And he agreed to admit service thereof, saying that that would be all right."

The attorney for defendant, when making the motion, specially appeared for that purpose. The court held the marshal's return to be valid, and a bill of exceptions was duly filed and allowed. Thereafter, the defendant appeared, and filed its answer.

It is at least doubtful whether the affidavits of Griffin and Lang were competent for the purpose of attacking the return; and it is also questionable whether the objection to the service could be raised by a simple motion, instead of a regular plea, where, as in this case, the return of the officer was regular upon its face. Harkness v. Hyde, 98 U. S. 476, and Amy v. Watertown, 130 U. S. 302, 9 Sup. Ct. 530, cited upon this point by defendant, were cases of an entirely different character. In the Harkness Case the officer made return showing that the service was made upon an Indian reservation, where, under the law, he had no jurisdiction to serve any process. In the Amy Case the law required the service of the process against a municipality to be made upon the mayor, and the return showed that the service was made upon the ex-mayor, whose term of office had expired. In both cases the facts appeared upon the face of the returns. In such cases, presenting only questions of law, the court had the right to dispose of the same upon motion. In the present case the facts tend to show that there was a technical defect in the service of the summons; but it is purely technical, and not jurisdictional, and does not appear upon the face of the return. The service was irregularly, not illegally, made. The officer, in making the return, subjected himself to criticism, if not to censure and condemnation, for his acts, for there is never any excuse for an officer to make any return that is not strictly in accordance with the facts.

If the question is to be considered upon its merits, we are of opinion that the court did not err in denying the motion to set the service aside. Under the statute of Washington, the service of summons against a railroad corporation is to be made by deliver-

ing a copy thereof, together with a certified copy of the complaint, to any station, freight, ticket, or other agent thereof within the state. 2 Hill's Ann. St. Wash. 173. The affidavit of Griffin, if competent, does not clearly and affirmatively show that he was not such an agent. It is evasive. He says that he is not an officer or agent of the defendant; but he adds that he is an agent of the Union Depot Company, and, as such agent, sells such tickets as said Union Depot Company furnishes for sale. The only reasonable inference to be drawn from the facts stated is that, if this company gave him tickets of the defendant to sell, he would, of course, sell them, and did sell them. In the absence of a positive, clear, and unequivocal statement of his position and duties as to the sale of the defendant's tickets, the court had the right to hold that he was a ticket agent of the defendant, upon whom service might, under the provisions of the statute of Washington, be made. The affidavit bears upon its face the appearance of having been made as a subterfuge, instead of presenting any meritorious ground to defeat the service of the summons. Forrest v. Railroad Co., 47 Fed. 2.

But it is claimed that no personal service of the summons was made upon the agent. No personal service was made on the 7th of August, 1891. The officer's return to that effect was false. It is not denied, however, that he received the papers the next day, and that upon inquiry he so notified the officer, and acknowledged service of the process. There is no denial of the service, except the technical one that the officer did not personally hand the summons to the agent. Under all the facts of this case, the action of the court in overruling defendant's motion, upon whatever ground it may have been based, was not erroneous.

2. During the trial the plaintiff called W. H. Butterfield, who was allowed to testify, as an expert, that "it was absolutely necessary to have two brakemen to set the brakes" on a train like the one upon which plaintiff was employed. This testimony was objected to by defendant upon the grounds (1) that the witness was not qualified to express an opinion; (2) because the testimony was incompetent. It is undoubtedly true that witnesses must ordinarily state facts, and not give their opinions. Expert and opinion evidence ought only to be received in cases of necessity, in regard to matters which require peculiar skill and knowledge, which are not common to men in general, and without which knowledge the jury would be unable, from the facts, to properly decide the matter. If the relation of the facts and their probable results can be determined without especial skill and knowledge, the facts themselves must be given in evidence, and the conclusions or inferences must be drawn by the jury.

Under the pleadings and the evidence in this case, it was competent for each party to give testimony as to whether or not the employment of only one brakeman was sufficient to check or control the speed of the train by means of the hand brakes upon the cars. This question, to be properly answered, required some skill and knowledge upon the part of the witnesses as to the character and locality of the brakes, and as to the number of brakemen re-

quired to manage the same, which could not fairly be said was within the experience and knowledge of men who had never been engaged in running and managing a train of cars.

In Railroad Co. v. Bailey, 11 Ohio St. 335, the court said:

"That the running and management of railroad locomotives and trains is so far an art outside of the experience and knowledge of ordinary jurors as to render the opinions of persons acquainted with the running and management of such locomotives and trains. as experts, admissible and proper testimony, in proper cases, is very clear on principle, and is so recognized in Quimby v. Railway Co., 23 Vt. 394, and Railway Co. v. Reedy, 17 Ill. 580. See, also, Railroad Co. v. Smith, 22 Ohio St. 227."

Butterfield, as to his qualifications, testified that he was an engineer by profession, and that he was at the time of the accident, and had been for some time previous thereto, a conductor working upon, and having charge of, a similar gravel train. This was at least prima facie sufficient to establish his qualification. Moreover, the question whether a witness is shown to be qualified to testify to any matter of opinion is always a preliminary question for the judge presiding at the trial, and his decision thereon is conclusive, and will not be reversed unless manifestly erroneous, as matter of law. Spring Co. v. Edgar, 99 U. S. 658; Manufacturing Co. v. Phelps, 130 U. S. 520, 9 Sup. Ct. 601; Railway Co. v. Warren, 137 U. S. 353, 11 Sup. Ct. 96; Coasting Co. v. Tolson, 139 U. S. 559, 11 Sup. Ct. 653; Towboat Co. v. Starrs, 69 Pa. St. 41; Perkins v. Stickney, 132 Mass. 217; Slocovich v. Insurance Co., 108 N. Y. 56, 14 N. E. 802; City of Ft. Wayne v. Coombs, 107 Ind. 84, 7 N. E. 743.

3. It is claimed that the court erred in allowing Dr. Harvey to testify as to certain facts told him by the plaintiff during the course of a medical examination made for the purpose of enabling him to give testimony in the case. Dr. Harvey, as an expert physician, testified with great clearness and minuteness as to the extent, nature, and character of the numerous injuries he found upon the person of the plaintiff, and gave his professional opinion as to their probable effect upon the plaintiff's physical condition in the future. In his entire testimony, which is quite lengthy, there are only two allusions made to anything that the plaintiff told him. The examination took place a short time before the trial. The effect of an injury to the spine, whether permanent or not, which was one of the many injuries which plaintiff received, depended, to some extent at least, upon the length of time that had occurred after the injury; and, in giving his testimony as to the effect of this injury, Dr. Harvey said, "I was told by the patient that he had been injured over two years since." There was certainly no prejudicial error in admitting this statement. It was a conceded fact in the case, proven by several witnesses, and not controverted by any.

As a result of the examination, the witness said, if the injury "was caused over two years ago, it is permanent. It becomes a serious matter, and increases with time. * * * It will be a physical impossibility for him to engage in any manual labor that requires

the use of that limb or the spine." Upon his cross-examination, after testifying to the fact that the examination which he made was strictly physical, the witness said: "I knew that his bowels didn't work, from symptoms of that character, and what he told me. He told me that his kidneys were out of order." This testimony does not come within the principle of the rule of exclusion of hearsay testimony, as laid down in the authorities cited by defendant, to the effect that the physician who makes the examination for the purpose of giving testimony in the case is not permitted to state what the patient told him in reference to the specific cause of the injury, which is, of course, one of the issues ordinarily presented at the trial for the jury to decide; but the rule is just as well settled that the physician may testify to what the patient said in describing his bodily condition, and the character and manifestations of his pains, when such statements become necessary to enable the physician to give his opinion as an expert, on account of the latent nature of the facts to be proved by it. The action or nonaction of the internal organs could not readily be seen. In such cases the statement of the injured party is ordinarily admissible, in order to enable the expert physician to determine the real nature of the trouble at the time of the examination. But, in addition to this matter, it appears from the evidence in this case that the physician knew what the trouble was from the plaintiff's symptoms, discovered by his own examination, as well as from what the plaintiff told him. The character of the examination made by the physician was very thorough, and was such as to render it entirely free from any suspicion that the statement was made by plaintiff for the sole purpose of manufacturing testimony for the trial, which is one of the principal mischiefs that the rule for the exclusion of the patient's statements was intended to guard against.

We are of opinion that the testimony given by the physician, including what the plaintiff told him, was clearly admissible.

In Barber v. Merriam, 11 Allen, 324, the court said:

"It is true that evidence of the statements of a party to his physician or surgeon, of his bodily ailments and symptoms, is, in its nature, hearsay, and is liable to some of the objections which lie against that kind of testimony. Its admissibility is an exception to the general rule of evidence, which has its origin in the necessity of the case. The existence of many bodily sensations and ailments which go to make up the symptoms of disease or injury can be known only to the person who experiences them. It is the statement and description of these which enter into, and form part of, the facts on which the opinion of an expert as to the conditions of health or disease is founded. As they can be proved only by the declarations of the party whose bodily condition is the subject of inquiry, such declarations must be admitted, or the proof of them will fail altogether. To the argument against their competency, founded on the danger of deception and fraud, the answer is that such representations are competent only when made to a person of science and medical knowledge, who has the means and opportunity of observing and ascertaining whether the statements and declarations correspond with the conditions and appearance of the persons making them, and the present, existing symptoms which the eye of experience and skill may discover."

In Railroad Co. v. Sutton, 42 Ill. 440, cited and relied upon by defendant, the court, in reference to the rule, says:

"A physician, when asked to give his opinion as to the cause of a patient's condition at a particular time, must necessarily, in forming his opinion, be, to some extent, guided by what the sick person may have told him, in detailing his pains and sufferings. This is unavoidable, and not only the opinion of the expert, founded in part upon such data, is receivable in evidence, but he may state what his patient said in describing his bodily condition, if said under circumstances which free it from all suspicion of being spoken with reference to future litigation, and give it the character of res gestae."

In Railroad Co. v. Newell, 104 Ind. 265, 3 N. E. 836, the court, after a lengthy discussion, and a reference to numerous authorities, held that a physician, as a basis for his opinion, may testify to statements made by a patient in relation to his symptoms and conditions, when received during, and necessary to, an examination with a view of enabling the physician to give his opinion as an expert, although such statements are made after the patient had commenced an action to recover damages for the injury. To the same effect, see Quaiffe v. Railway Co., 48 Wis. 513, 4 N. W. 658; Johnson v. Railroad Co., 47 Minn. 430, 50 N. W. 473; Railway Co. v. Snyder, 117 Ind. 435, 20 N. E. 284.

4. In reference to the merits of this case, it may be said that there are certain well-defined rules and clearly-settled principles of law relating to the duties, obligations, and liabilities of railroad corporations and their employes, which, in their application to the particular facts of this case, will enable us to virtually dispose of many of the assignments of error without specific notice of each assignment, or of the points specifically urged by counsel. The general rule exempting the railroad company, as the common master, from liability to one of its servants or employes for injuries occasioned by the negligence of a fellow servant in the same common employment, is substantially to the effect that, when the employe engages with the master for the performance of certain specified duties and services, he takes upon himself the natural and ordinary risks, hazards, and perils incident to the performance of such services. This necessarily includes the risks arising from the carelessness and negligence of others who are in the same common employment, because these are perils which the servant is as likely to know, and against which he can as effectually guard, as the master. They are perils incident to the service, which can be as distinctly foreseen by him as by the master. This general rule is too well settled to require any elucidation, or the citation of authorities in its support. But to this general rule there are certain well-defined qualifications or exceptions that should be constantly kept in mind in the application of the rule to the facts of any given case.

These exceptions arise from the obligation which the master owes to the servant not to expose him, while engaged in performing the business of the master, to hazards against which he might be guarded by reasonable diligence upon the part of the master. With reference to this obligation, the master is required by the law to observe all the care which prudence and the exigencies of the situation demand, in providing the servant with tools, machinery, and appliances, and all other instrumentalities connected

with the business in which the servant is employed, adequately safe for such uses. It is implied in the contract of employment between the parties that the servant risks the dangers which ordinarily attend, or are incident to, the business in which he engages; including, as before stated, the carelessness and negligence of other servants engaged in the same work or common employment, with whose habits, conduct, and capacity he has, in the course of his duties, an opportunity to become acquainted, and against whose negligence he is able to take such care and precaution as his judgment or inclination may suggest. But it is equally implied by the same contract that the master shall supply the means for the conduct of the business; and justice and public policy require that, in selecting such means, he shall not be wanting in ordinary care. His negligence in this respect, if any, is not a risk or hazard usually or necessarily attendant upon the business in which the servant is engaged, for the obvious reason that the servant who is to use the machinery, appliances, and instrumentalities provided by the master has ordinarily no connection with their purchase, or with their preservation or maintenance in suitable condition after they have been supplied. The leading cases upon this subject in the state courts are Ford v. Railroad Co., 110 Mass. 240, and Railroad Co. v. Moore, 29 Kan. 633.

This principle is fully recognized and clearly stated by the supreme court of the United States in Railroad Co. v. Baugh, 149 U. S. 386, 13 Sup. Ct. 914, as follows:

"A master employing a servant impliedly engages with him that the place in which he is to work, and the tools or machinery with which he is to work, or by which he is to be surrounded, shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery; and, when he employs one to enter into his service, he impliedly says to him that there is no other danger in the place, the tools, and the machinery than such as is obvious and necessary. Of course, some places of work and some kinds of machinery are more dangerous than others; but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But, within such limits, the master who provides the place, the tools, and the machinery owes a positive duty to his employe in respect thereto. That positive duty does not go to the extent of a guaranty of safety, but it does require that reasonable precautions be taken to secure safety; and it matters not to the employe by whom that safety is secured, or the reasonable precautions therefor taken. He has the right to look to the master for the discharge of that duty; and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employe, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects. Therefore, it will be seen that the question turns rather on the character of the act, than on the relations of the employes to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but, if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor. But, it may be asked, is not the duty of seeing that competent and fit persons are in charge of any particular work as positive as that of providing safe places and machinery? Undoubtedly it is, and requires the same vigilance in its discharge. But the latter duty is discharged when reasonable care has been taken in providing such safe place and machinery, and so the former is as fully discharged when reasonable precautions have been taken

to place fit and competent persons in charge. Neither duty carries with it an absolute guaranty. Each is satisfied with reasonable effort and precaution. * * * It would be easy to accumulate authorities on these propositions, for questions of this kind are constantly arising in the courts. It is enough, however, to refer to those in this court. In the cases of Hough v. Railway Co., 100 U. S. 213, and Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, this court recognized the master's obligation to provide reasonably suitable place and machinery, and that a failure to discharge this duty exposed him to liability for injury caused thereby to the servant, and that it was immaterial how, or by whom, the master discharged that duty. The liability was not made to depend in any manner upon the grade of service of a coemploye, but upon the character of the act itself, and a breach of the positive obligation of the master. In both of them the general doctrine of the master's exemption from liability for injury to one servant through the negligence of a coemploye was recognized, and it was affirmed that the servant assumed all the risks ordinarily incident to his employment."

These general rules and principles were stated, and numerous authorities cited in their support, by this court, in the case of Railroad Co. v. Charless, 2 C. C. A. 380, 51 Fed. 562, and followed in Southern Pac. Co. v. Lafferty, 6 C. C. A. 474, 57 Fed. 536.

There is still another principle to be stated which is applicable to the facts of this case, and which was discussed by this court in the Lafferty Case, viz. that the master owes a duty to his servants, of employing a sufficient number to do the work assigned to be performed, so far as may be reasonably necessary to enable them to do it in safety, and the master must exercise ordinary care in order to relieve himself of liability in this respect. 1 Shear. & R. Neg. § 193; Flike v. Railroad Co., 53 N. Y. 549; Booth v. Railroad Co., 73 N. Y. 38.

Applying these principles to the facts of this case, it is apparent that the court did not err in overruling the defendant's motion to instruct the jury to find a verdict for the defendant. It was a question of fact, raised by conflicting evidence, for the jury to decide, whether the proximate cause of the injury was the result of the carelessness or negligence of the plaintiff, or his fellow servants in charge of the train, or whether it was caused by the negligence of the defendant in failing to provide suitable and proper appliances and brakes, or furnishing sufficient help, to properly control and manage the train. It is well settled by frequent decisions of the supreme court of the United States that no case should be withdrawn from the jury unless the conclusion from the facts necessarily followed, as matter of law, that no recovery could be had, upon any view which could be reasonably drawn from the facts which the evidence tended to establish. Kane v. Railway Co., 128 U. S. 91, 9 Sup. Ct. 16; Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118; Dunlap v. Railroad Co., 130 U. S. 649, 9 Sup. Ct. 647; Railway Co. v. Cox, 145 U. S. 606, 12 Sup. Ct. 905.

In Railway Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 679, the court said:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

See, also, Southern Pac. Co. v. Lafferty, 6 C. C. A. 474, 57 Fed. 536; Railroad Co. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748.

5. There are several assignments of error in relation to certain portions of the charge given by the court to the jury, some of which will be specifically noticed; and, as to others, it is a sufficient answer to say that the charge of the court must be considered in its entirety, instead of separately. It is not to be expected that each instruction in the charge will contain all of the qualifications and exceptions to the rule therein stated. It is sufficient if the qualifications, exceptions, or modifications are elsewhere stated in such a manner as to make it clear and plain that the principles applicable to the case, and to the particular question involved in the instructions complained of, were fairly, fully, and correctly stated in the charge of the court, as a whole. There is no evidence tending in the slightest degree to show any negligence upon the part of the plaintiff in the discharge of his duties as fireman. The court charged the jury that the defendant was not liable for the neglect, if any, of Sissler, upon the train, in failing to apply the brakes on the cars in the train for the purpose of controlling the speed of the train, or stopping the same, and that if the jury found that one brakeman could have stopped the train by applying all the brakes upon the cars composing the train, and that the train could have been stopped by the use of such brakes, and that Sissler negligently failed to apply such brakes, and should find from the evidence that the negligence of Sissler, in failing to apply the brakes, was the sole cause of the injury to plaintiff, the plaintiff could not recover. The court further charged the jury that if it should find that the injury to plaintiff resulted from the negligence, if any, of Hill, the engineer, in failing to keep said train under control, and that Hill could have stopped the train by reversing his engine, and using no other appliances, and that it was safe for him to do so, under the circumstances under which the train was running, and that such neglect on the part of the engineer was the proximate and only cause of the injury to the plaintiff, then the plaintiff could not recover. The court emphasized these points by further charging the jury as follows:

"If you find from the evidence that the injury to the plaintiff resulted from the neglect, if any, of the engineer, or the neglect, if any, of Sissler, or both of them combined, in failing to keep the train under control, or in stopping the same, and that the said engineer, or said Sissler, or both of them, with the appliances at hand, could have controlled the train, under the circumstances under which it was running, or have stopped the same in time to have avoided the collision, and if you further find that the failure of said Sissler, or said engineer, or both of them, to keep said train under control, or to have stopped the same, was the sole, proximate, and immediate cause of the injury to the plaintiff, then I charge you that the plaintiff cannot recover in this action, and you must find for the defendant."

In the light of the charge of the court upon this point, it is manifest, from the verdict, that the jury must have found that in running, managing, controlling, or endeavoring to control, the train, the plaintiff, the engineer, Hill, and brakeman, Sissler, were free from fault, or at least that their negligence, or the negligence of

either of them, if any, was not the proximate cause of the injury, and that the defendant was negligent in furnishing said train, in not using ordinary and reasonable care in providing suitable appliances, machinery, and brakes, or in not having a conductor or another brakeman, on the train, and that the proximate cause of the injury to plaintiff was owing to the negligence of the defendant. But, in this connection, it is contended by the defendant that the court erred in giving other instructions, which were erroneous, and of such a character as to mislead the jury to the prejudice of defendant. The instructions complained of were given after the jury had retired to deliberate upon their verdict, and had returned into court with a request for further instructions relative to there being only one brakeman on the train, and with reference to the train of cars left standing on the main track. The court, in reply to these questions, instructed the jury as follows:

"As to whether the defendant was negligent in the particulars charged, it is charged that the failure to provide a conductor was negligence; that the company negligently failed to provide a conductor. Also, it alleges that there was only one brakeman. In regard to the cars that were standing on the main track beyond the station at Rockford, I stated to you that it was the duty, under the rules and regulations of the road, for the engineer to have brought his train to a stop at the station, provided the train was under control; or, if he was able to bring it to a stop, he should not pass the station without first bringing the train to a full stop. If you believe from the evidence that the engineer did not have control of the train, so that he was unable to stop it at the station, and that, necessarily, the train went by the station, then you have a right to take into question the situation, and determine whether it was negligence on the part of the company, through its agents at Rockford, in allowing these cars to remain there on the main track, and whether that negligence caused this injury, or whether that in connection with the other defects in the train, and the failure of the defendant to perform its duty in regard to the makeup altogether, was the cause of the injury. If the evidence should satisfy you that there was no necessity for this train to pass the station without coming to a stop there, and the engineer could have stopped, and through his negligence the cars dashed by into the cars beyond, then this complaint does not entitle the plaintiff to recover damages for the injury to him, if it was caused by the negligence of the engineer. That is not the ground of his complaint, and therefore he cannot recover damages in this case, if you find that that was the cause of the injury. I think, perhaps, I have made myself clear on that point. Primarily, taking into question the cars standing there on the track, it is a question whether the conductor [engineer] had control of the train, and could not have stopped it, or not. If he did, and went recklessly by, then the collision was due to his recklessness. If he could not help it, then it is for you to say whether, the cars being there, and the train dashing by into them, the defendant was negligent in this particular."

In giving this instruction the court inadvertently used the word "conductor," instead of "engineer." When its attention was called to this fact, the court said to the jury:

"I inadvertently used the word 'conductor,' when I meant 'engineer,' in referring to the handling of the train. Now, if there was a conductor on the train, or not, or if the other man was only a brakeman, without a conductor's authority or power, is one of the questions for you to pass upon, in this case. I do not mean to tell you whether there was a conductor on that train, or not. You must ascertain that fact."

Subsequently, when the jury again came into the court room for further instructions, one of the jurors asked the question, "Whether

or not we shall consider this man, Crowley, a coservant?" The court replied:

"That depends upon what the evidence shows to you the fact to be in regard to his situation there. If he had a situation to control the movements of the train, and control the action of the plaintiff and his coemployes about the road, and the operations of the trains, he would not be a coservant. But if he was a mere employe, like the rest of them, without authority to command,—that is, to control and to command the movements of the trains,—he would be a coservant."

Another juror then asked the court, "Would a conductor be a co-servant?" The court replied, "Yes," and then said:

"The conductor on the same train in which the plaintiff was serving as a fireman— You ask if the conductor would be a coservant. I answered you wrong. A conductor of the same train on which the plaintiff was a fireman would be his vice principal, and not a coservant."

The contention of defendant is that the court, in one of its answers, left the question for the jury to determine whether Sissler was a conductor, and, if the jury should so find, then the court, in answer to the last question asked by a juror, conveyed the meaning to the jury that, as matter of law, Sissler would be a vice principal, for whose negligence the defendant would be responsible; that the remarks of the court were in conflict with other instructions; and that notwithstanding the regular charge of the court, previously and correctly given upon this subject, that the defendant was not responsible for Sissler's negligence, if any, the jury had the right to take the last expression of the court, and may have been guided and controlled by it. If it could be fairly and reasonably said that the remarks of the court in answer to the questions asked by the jurors were in direct conflict with his previous instructions, then the contention of defendant should be sustained, but an examination of the entire record convinces us that there is no such conflict. The remarks of the court, given upon the spur of the moment, were not elaborated upon, and made as perfectly clear as the principles which were enunciated in the charge. This is natural. The first reply was made to correct an inadvertence in the use of words, and at the same time, by so doing, to remove the impression, if any, that the jury might have had, from the inadvertent use of the word "conductor," that the court considered there was a conductor on the train. It may be conceded that the last answer did not contain the qualifications which should have been given upon the question as to whether or not a conductor on the same train on which the plaintiff was a fireman would be a vice principal of the defendant, within the rule announced by the supreme court in Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, and by this court in Railroad Co. v. Smith, 59 Fed. 993. But the remarks of the court must be taken in connection with what was previously said by the court in reply to the question of another juror as to whether or not Crowley was a coservant.

And, in any event, it is evident that the jury, as sensible men, were not misled into the belief that Sissler, who had been tem-

porarily placed in charge of the train by Crowley, the conductor, was a vice principal of the defendant, for whose negligence, if any, the defendant would be responsible. With reference to the negligence of Sissler, whether called a conductor or brakeman, the jury were clearly, positively, and repeatedly charged and instructed that the defendant could not be held responsible for any careless or negligent act of Sissler. Even after the remarks complained of were made, the court, in answer to the question of a juror, "Shall we take into consideration the manner in which the employes on this train performed their duties,—whether or not they could have held the train under control?" answered "Yes," and said, "If you fix the responsibility on the engineer, or on Sissler, as I instructed you before, the plaintiff could not recover."

From all the instructions given by the court upon the question of Sissler's negligence, it becomes plain that the jury could not have been misled upon this subject by the remarks of the court objected to. As was said by Judge Brewer in Crew v. Railway Co., 20 Fed. 94:

"The question, in all such cases, is not whether some technical error may not have crept into the instructions, but whether, taking the case as a whole, it is apparent that the law was presented fairly and correctly to the jury."

6. It is argued that the court erred in charging the jury upon the question of defendant's negligence in leaving the cars on the main track at Rockford. The charge of the court was substantially the same as contained in the instruction given in reply to the question of a juror, heretofore copied, and need not be again repeated. The same objection is made to each.

We are of opinioin that the court did not err in giving this charge. There was testimony given in the case which called for an instruction upon this point. The fact that Crowley, who was a conductor having the charge, management, and control of the four gravel trains, including the one upon which the plaintiff was employed, gave directions to Hill, the engineer, and Sissler, the brakeman, to let their train come, and the road would be clear, in connection with the other facts and circumstances, justified the giving of the instruction, and the principles contained therein were proper for the jury to consider. The only criticism bearing upon the question of error in said instruction is that, standing alone, and read by itself, it would seem to limit the jury to the sole consideration of the question whether the engineer could have stopped the train at Rockford before passing the station, and that it does not, of itself, submit the question to the jury whether Sissler, the brakeman, could not have so controlled the train as to have enabled the engineer to stop it; and upon this point it is claimed that the jury might have found that the engineer could not have stopped the train, but that Sissler could. This criticism is disposed of by what we have already said in answering the argument of defendant to the other instructions given by the court in reply to questions asked by the jurors, which makes it equally clear that the jury could not have been misled by the failure of the court to have

mentioned Sissler's negligence again in this instruction, although it would have been proper so to do. The giving of an erroneous instruction, which was not prejudicial to the objecting party, is never deemed to be sufficient to justify a reversal of the case. Railway Co. v. Ives, 144 U. S. 409, 12 Sup. Ct. 679.

7. Upon the question of the burden of proof to show contributory negligence upon the part of the plaintiff, the court charged the jury as follows:

"A defense has been interposed here, in the answer, charging him with neglect and carelessness which contributed in producing the injury. This would be a complete bar, if it is shown; but the burden is upon the defendant to show that by positive evidence, sufficient to outweigh all the evidence to the contrary. Unless that is so shown, no carelessness or neglect of duty on the part of the plaintiff could be a bar to his recovery. If the defendant was negligent in the particulars specified, which neglect was the direct and proximate cause of the injury, any contributory negligence on the part of the fellow servants or coemployes of the plaintiff would not affect his right to recover damages."

If this charge is reasonably susceptible of the construction claimed by defendant,— that it devolved upon the defendant to affirmatively prove, by positive evidence, that plaintiff was guilty of contributory negligence, independent of the evidence that was given upon the part of plaintiff,—then the instruction is erroneous. The principle of law is well settled that if the proximate and sole cause of the injury is to be attributed to plaintiff's contributory negligence, or the negligence of his fellow servants or coemployes, this would be fatal to his right to recover; and it makes no difference how or when that fact appears during the trial,—whether by inference from the facts testified to upon the part of plaintiff, or by affirmative evidence introduced by the defendant. It is wholly immaterial who proves the fact, so long as it is proven. The use of the word "positive" in the instruction was unfortunate. The same mistake was made in another portion of the charge of the court, which required the plaintiff to bring "affirmative evidence, of a positive character," as to the negligence of the defendant, "sufficient to outweigh all evidence to the contrary as to those facts." Wherever the facts are of such a character that a jury might reasonably infer therefrom that the defendant was guilty of negligence, or that the plaintiff contributed by his own negligence to the accident which caused the injury, it becomes a question for the jury to decide. It has never been required that evidence of negligence should be direct and positive. In the very nature of the case, the plaintiff must labor under difficulties, in proving the fact of negligence; and, as the fact is always a relative one, it is susceptible of proof by circumstances bearing more or less directly upon the fact of negligence,—a kind of evidence which might not be satisfactory in other cases, open to clearer proof. This is in accord with the general principle of the law of evidence which holds that to be sufficient evidence which, in its nature, satisfies an unprejudiced mind. 1 Shear. & R. Neg. § 58, and authorities there cited.

But the charge of the court is not, under the facts, susceptible of the construction sought to be placed upon it by the defendant.

It is manifest, however unfortunate certain words or phrases in the charge are, that, when it is carefully considered, it simply means, and the jury must so have understood it, that the burden was not upon the plaintiff, in making out his case, to prove that he and his coemployes were entirely free from fault; that the question of contributory negligence was an affirmative defense; that the burden is upon the defendant to establish it by "evidence sufficient to outweigh all the evidence to the contrary;" and that, unless the contributory negligence "is so shown," it would not bar the right "to his recovery."

The question as to whether the burden of proof rests upon defendant or upon plaintiff, in actions of this character, upon the issue of contributory negligence, has been the subject of frequent discussion in all of the state courts; and there never has been, and probably never will be, any uniformity in the decisions in the state courts. Id. §§ 107, 108. It is sufficient to state that in a majority of the states, including the state of Washington (Railroad Co. v. O'Brien, 1 Wash. 599, 21 Pac. 32; Spurrier v. Railway Co., 3 Wash. 659, 29 Pac. 346), the burden of proving contributory negligence rests upon the defendant; and this is the rule almost universally followed in the United States circuit courts, and is approved by the decisions of the supreme court of the United States. Railroad Co. v. Gladmon, 15 Wall. 401; Railroad Co. v. Horst, 93 U. S. 291; Hough v. Railway Co., 100 U. S. 214; Railroad Co. v. Mares, 123 U. S. 721, 8 Sup. Ct. 321.

8. With reference to the refusal of the court to give the instructions asked for by defendant, it is only necessary to say that the court is never compelled or required, by the rules and practice of the national courts, to give instructions in the language used by counsel, simply because the instructions asked for contain correct principles of law that are applicable to the facts of the case. It is always within the discretion of the court to give its charge in its own language, and such is the usual and better practice. If the instructions so given correctly embody all the principles of law applicable to the case, then the appellate court will not consider the question whether the instructions asked for by counsel were, or were not, in all essential particulars, correct.

In Railroad Co. v. Horst, 93 U. S. 295, the court said:

"It is the settled law in this court that if the charge given by the court below covers the entire case, and submits it properly to the jury, such court may refuse to instruct further. It may use its own language, and present the case in its own way. If the results mentioned are reached, the mode and manner are immaterial. The court has then done all that it is bound to do, and may thus leave the case to the consideration of the jury. Neither party has the right to ask anything more."

Keeping in mind these general principles, it is clear to us that the court did not err in declining to give the various instructions asked for by defendant's counsel.

9. After a thorough examination of the evidence, the instructions of the court, the various assignments of error, the arguments of counsel, and the authorities cited by them, we are of opinion

that no error was committed by the court which was prejudicial to the defendant. The instructions given by the court were in the main in accordance with the general principles we have announced, and in all other respects were as favorable to the defendant as the law would warrant, and the facts justify.

The judgment of the circuit court is affirmed, with costs.