## SOUTHERN PAC. CO. v. JOHNSON.

(Circuit Court of Appeals, Ninth Circuit. November 5, 1894.)

CONTRIBUTORY NEGLIGENCE OF EMPLOYE.

An engineer who, to make necessary repairs, goes out on the running board of his locomotive while it is running 17 or 18 miles an hour, and while it is unusually dangerous because of the defects in the engine, when the engine and train can be stopped or the speed slackened in a short distance, is guilty of such contributory negligence as will preclude a recovery for his death, caused by being thrown from the engine.

Error to the Circuit Court of the United States for the District of Nevada.

Action by Eliza Ann Johnson, administratrix of the estate of Horace Johnson, deceased, against the Southern Pacific Company, to recover for the death of plaintiff's intestate, caused by defendant's negligence. There was a judgment for plaintiff, and defendant brings error. Reversed.

This action was brought by defendant in error, under an act of Nevada, against plaintiff in error, to recover damages for the death of her husband, alleged to have been caused by the carelessness and default of plaintiff in error. The defendant in error obtained a verdict for $25,000, but $10,-000 were remitted as an alternative to a new trial. At the close of the testimony in the court below, plaintiff in error (there defendant) moved the court to instruct the jury to find a verdict for it. The court refused, and this is assigned as error.

The statute under which this action was brought provided as follows: "Whenever the death of a person shall be caused by wrongful acts, neglect, or default, and the act, neglect, or default is such as would, (if death had not ensued,) have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured. * * *" Gen. St. Nev. § 3898.

The evidence of defects in the engine may be summarized from the testimony as follows:

Freeman (who was the fireman on the train): "Engine No. 1,266, on the 14th day of August, 1892, was a hard-running engine. I think it would be from looseness of the engine. Continual wear, I should think, would make it loose,—I mean wear of the boxes. The boxes were loose, and the cylinders were loose, and there would be a continual pounding and jarring. There was more or less swinging motion in cab and locomotive, occasioned by this looseness. At the time of the accident, as the engine was going down Brown's hill, there was considerable jarring. It was a hard-running engine."

Peterson testified: "Her cylinders were loose, particularly on the left side, and her driving boxes were worn out, and probably her brasses also worn or in a bad condition. This would have the effect on the engine of giving it a swinging motion, especially on the curves. It would rock you from side to side very rapidly. The engine would ride like a dead-axle wagon. It will kind of strike solid. This would certainly increase the danger of the engineer in going out of his cab onto the footboard when the engine was in motion quite

a little. I do not know anything about the driving wheel, but I know that when I saw the engine she had a very bad pounding in the boxes. It would pound like a sledge hammer. The effect of lost motion causes more or less inconvenience to the engineer and fireman in the respect mentioned before. It rides harder, and will have a swinging motion more to one side than the other. When a fireman is firing up the engine, and it is on a curve, the least swing will throw him from one side of the cab to the other. That is what is called 'lost motion.' That is true on a perfectly straight track. It will swing from side to side on a perfectly straight track if you strike low joints in your track. * * * Wornout driving boxes cause a pounding in your engine."

Driscoll testified: "On the morning of the fourteenth of August, when I was on her, she was in a very rough riding condition, caused, I presume, from the poor condition of the engine at the time. There would be several causes which would produce hard riding. Being down on her boxes would cause it. Lost motion between the engine and tender would cause it. That is all I know of, unless it would be looseness of the engine. The wearing of the boxes would have a tendency to make the engine sway. As a matter of fact, this engine did sway and rock more than engines in general,—quite a good deal. The road at the place of the accident had some slight curves, but I do not think there were any sags on the line where this accident occurred. I know what you mean by 'sags.' I do not think there were any sags. I did not observe particularly the motion of the locomotive at the moment when Johnson disappeared. My attention was attracted at the time to some other place." Cross-examination: "I had been acquainted with engine No. 1,266, off and on, for about five years. I mean, by 'off and on,' that I have been away from Wadsworth for some time, and when I was away I did not know it then. I would go away, and then come back and renew my acquaintance with it. When I was at Wadsworth I knew it, and I was at Wadsworth most of the time. I knew this engine very well by reputation. I have known it for a period of about five years, and I know it had been in that condition for some time. I should judge for about three years. Johnson had not commenced to run on it then. He had been running it for about two years. I suppose that Johnson knew the condition of that engine better than I did. He knew that it rocked and swayed, and knew all about it. At the moment that Johnson disappeared, I do not know what the motion of the engine was. I had observed that rocking and swaying motion ever since I had been on the engine that morning. That was not the first time I had ever been on a train in connection with that engine. As to the time I had been on a train pulled by that engine before that time, I cannot say positively,—I should judge about two months; and I think Johnson was engineer at that time. I presume it had that rough riding and swaying motion then. I cannot remember whether it rocked and swayed at that time or not, I did not state that it had been rocking and swaying for two years that I knew of. I am sure of that. It had been swaying and rocking that day for about fifteen minutes. That is all. It took us, to run from Wadsworth to the place where the accident occurred, about two and one-half hours, and out of that time I was only on the engine fifteen minutes. I cannot remember whether it shook when I was on it, two months before. What knowledge I have of its swaying and rocking is confined to the fifteen minutes that I was on the engine that morning. I mean by 'rough riding,' an up and down motion and a to and fro motion. That motion to the right and left is what I call 'swaying.' I cannot say that it had this right and left motion for several months. On the morning of the fourteenth, so far as it was rough riding from this swaying backward and forward, I only knew it for fifteen minutes. Rough riding consists of an up and down motion or jarring, and also a to and fro motion or right and left motion,—both or either. The right and left motion is what I mean by the rocking and swaying, and I only knew this right and left motion for fifteen minutes before the accident occurred. I know she had it when I was on the engine before. If she did not have the right and left motion, and was still a rough riding engine, then it was confined to an up and down motion. I do not know how long I had known the engine to have that motion. I know she had it when I was on her before. I cannot say how long I was on that engine, or a train pulled by that engine, at the time I speak of,—two months before,—

but I think I was working ahead one trip. I do not remember where from. I was out seven or eight hours. This was two months before the accident. I do not know where or when. This was the time I discovered this rough riding condition. The other time was on the morning of August 14, 1892. I cannot remember any other time."

The circumstances of Johnson's death are related by two witnesses, Freeman and Driscoll, who were on the engine with him.

Freeman testifies as follows: "I was on this engine on the morning of the 14th of August, 1892, in the capacity of fireman. Had been fireman upon engine 1,266 five months. Mr. Johnson was the engineer during that time. On the morning of the 14th of August we left Wadsworth, I think, about 6:30 or a quarter of seven, I am not positive which. We were going to Winnemucca. They claim it is one hundred and thirty-five miles from Wadsworth to Winnemucca. That was the end of our run for that day, but if we were the only engine in Winnemucca, and a train came in, we were supposed to take it out. Our orders were to go to Winnemucca that day. Q. Did you witness the occurrence in which Johnson, the engineer, was hurt? A. Well, I did not see him at the time he fell off the train, but I saw him shortly afterwards. Q. Where were you at the time? A. I was in the cab, on the fireman's side of the engine. It happened about one or one and one-half miles this side of Brown's station, and about thirty-five miles from Wadsworth. Brown's hill is just this side. The hill slopes slightly towards Brown's, the greater part towards Wadsworth. The locomotive was on the eastern slope going towards the Humbolt. There are several small curves in the road at that place. Q. Where, with respect to these curves, did the accident take place? A. It was a straight track where the accident took place. Q. Were there any sags? A. No, sir; the character of the grade is not very steep. After we got over Brown's hill, we generally worked steam to give the train a good run, then shut off steam, and would roll into Brown's. We had an average train that day, I think, a full train, twenty loads; that is what we call a full train,— twenty carloads. Before we came to Brown's hill, Johnson was working the engine pretty hard. What we call 'we took a run' to Brown's hill. We got a pretty fast speed on to go up the hill. The engine was a hard-steaming engine. We could not keep steam up, and we had to double the hill. We took the first cut over, and went back after the second, and going down Brown's hill the water was pretty low. There was about an inch or an inch and a half in the glass. We had the blower on the engine, trying to get up steam. He tried to start his injector, and got it to prime a little water into the boiler. We had about ninety pounds of steam on, and he shut off to give me a chance to get up more steam, and, as he shut the injector off, the check stuck. As it did so, he picked up an eight-inch monkey wrench, and went out on the running board. Mr. Driscoll was standing back of him. Mr. Johnson went out on the running board, and, I believe, knocked the check valve down, because the water ceased coming back into the cab any more. Mr. Driscoll looked out, and Mr. Johnson was not there, and we threw the engine on the back motion, and I went over to the engineer's side and looked out, and saw Mr. Johnson was gone, and I looked back and could not see him, so I got down and ran back and found him in the ditch, with his feet up, and head down on his left side. After he had shut the injector off, the check stuck. I do not know as I can describe the injector very thoroughly. There are three parts, I think,— the ram, lazy cock, and jet. This machine is used to put water into the boiler from the tank. The check is out on the side of the boiler where the injecting pipe connects with it. There is a valve in it; that is, the check that was on this engine was a round cup valve, and the water had force enough to raise the valve and force itself into the boiler. It stuck up; that is, the water coming from the tank going into the boiler raised the valve, and it did not drop back. The result was the steam and water came back into the cab, after he shut the injector off, worse than I ever saw it. It was hot. The engineer and all of us had to get out of the way. I went out on the gangway, Driscoll went out on the tank, and Johnson got out on the running board to knock down the check valve. It is done by taking something and tapping on the top of it, and, if that does not knock it down, you must tap on the bottom of it. I did not see Johnson's hand on the check, but, after he went out, the steam

and water stopped flowing, and my determination was that the valve was knocked down. The foot board, or running board, is a board (there are different sizes) running from the back of the cab. It is on each side of the engine, and goes almost over the steam chest near the end of the boiler. It runs about one and one-half feet past the check valve, and is from seven to ten inches wide. With reference to that running board, this check is at the furthest end towards the front. When the check valve was stuck, and Johnson was on the front end, and we had only one and one-half inches of water in the boiler, I tried to work my injector on my side, because his stuck, and I could not work mine at all. I let it go, and did not bother, and after Mr. Johnson fell off the engine, we stopped and shut off the air pumps, so as not to use any more water. Driscoll cut the engine off, and went to Brown's station. I got some water and a sponge, and went back to Johnson, and took care of him the best I could. I attempted to use the left-hand injector because I wanted to get water into the engine. It was not necessary, but the more water in a hard-running engine the better. On that engine we carried 'out of sight' in the water-valve gauge glass. The water valve is nine inches long, and what we mean by 'out of sight' is to have that glass full. I tried to work the injector after Johnson had gone out on the board, but I could not at the time the check was up, because of the water and steam coming into the cab. After Johnson was hurt, Mr. Driscoll went to Brown's, and telegraphed to Wadsworth. I ran back and picked Johnson up, and bathed his temples and head. Driscoll came back and backed the engine up to the train, then came to the hind end of the train where I was, and we carried Johnson into the caboose. I think there was an engineer by the name of Short that took the train to Winnemucca. I went with the engine to Winnemucca. I know the engine was reported at Winnemucca. I was present when the report was made by Short to the night hostler. The engine reached Winnemucca a quarter of nine on the evening of the 14th, and Johnson fell from the engine at 8:30 in the morning. The next morning about ten o'clock the engine was taken out again, and was run to Carlin. I fired her to Carlin. The check stuck three or four times in the trip to Carlin. There was no other trouble on that trip." The testimony was in effect repeated on cross-examination, and he further testified: "The train was running at the time at 17 or 18 miles an hour. I saw Johnson go on the running board."

Driscoll testified as follows: "I left Wadsworth, I should think, about 6:30 in the morning. Horace Johnson was engineer. George Freeman was fireman. I was upon the locomotive at the time Johnson was thrown off. I came there in this way· It was customary to double the hill. With a full load we always doubled it, taking one section over, and then coming back and getting the other. Brown's was a coaling station. It was customary for the rear brakeman to ride on the engine, and assist. I was on the engine to run over to Brown's. The train was divided. It was my duty to be on the front section of the train at that time. I had known engine No. 1,266 before August 14, 1892, over five years, and had ridden upon it before, but not very often. I was as well acquainted with the engine as with any other engine that trainmen had to work with. I was on the engine just back of Johnson. We went down the hill, perhaps three-fourths of a mile. Shortly afterwards he shut the injector off, and the check stuck up. Steam commenced to come back through the overflow into the cab. I stepped back upon the gangway, and sat upon the front of the tank directly back of the cab. The fireman and brakeman stepped into the opposite gangway. I looked out and saw Johnson go out with his handrail and a monkey wrench, I think, in his hand. I turned and looked at the fireman and brakeman. The fireman had his hand and arm up, trying to keep off the steam. He came back into the cab, and attempted to work his injector. I looked out again through both windows, and I could see the engineer strike the check valve with whatever he had in his hand. I turned around again and looked at Freeman, and when I looked outside again, perhaps half a minute later, I saw the engineer, Johnson, standing up. I took my eyes off him, and when I looked out again I did not see him. I looked down towards the ground, and I could see him doubled up, and he was either just striking the ground, or else had struck and was on the rebound. I reversed the engine and stopped the train as quickly as possible.

The brakeman went back to where Mr. Johnson was. I had orders to cut the engine off and run to Brown's station, and advise Wadsworth of what had occurred. I did so, and Engineer Gunn was at Brown's station with a broken-down engine. He had instructions from Wadsworth to come back and take the train. I saw Johnson shortly after he fell off, and helped him into the caboose. He was then senseless and bruised severely. I washed the blood off him. At the moment when the injector valve stuck, Johnson was sitting on his seat. The train was in motion. The grade was down hill. Steam was shut off. The train. was running of its own accord. It had no propelling force. It was down hill, and trains will run down hill alone. I think we had twenty-two cars. It is a full train for a seventeen-inch engine. The train, at that moment, was going, I should think, about eighteen miles an hour. As it went forward it would very soon slow up. When Johnson went out on the board, I do not know as there was any material difference in the speed of the train. To check the speed of the train it would be necessary to apply the air. It is applied with the engineer's valve. At the time the check stuck up, there was considerable hot water and steam coming into the cab, and it was very hot. There were large drops of hot water. It got into the cab from the overflow and the injector. I got out of the way to escape from the steam, and was protected by the rear windows and a part of the cab. The fireman first stepped over into the gangway on the left-hand side. He then came back, and tried to work his injector. The brakeman remained where he was. The tapping that Johnson delivered upon the injector caused the check to seat itself, thereby stopping the steam. It did have that effect, and it was necessary to be done. There is no other way that I know of that the steam and hot water could be stopped from the overflow from coming into the cab. The only other way by which water could be put into that boiler, excepting by using that injector, would be by using the left-hand injector, and that would not work when the fireman attempted to use it. The amount of water in the boiler is indicated by the glass. As an engineer, I would say it is necessary to keep water in the boiler to keep it from burning, and to furnish steam for the engine. Every engineer tries to keep, generally, from one-half to three-fourths of a glass of water. The glass is nine or ten inches long. It is the intention to keep from four to eight inches of water in the boiler. When the water in the glass gets below that, the engineer generally tries to catch up with the water again. I have ridden on Engine No. 1,266, and have known her four or five years."

On cross-examination he said: "I suppose that Johnson knew the condition of the engine better than I did. He knew that it rocked and swayed, and knew all about it. At the moment that Johnson disappeared, I do not know what the motion of the engine was. I had observed that rocking and swaying motion ever since I had been on the engine that morning. * * * It had been swaying and rocking that day for about 15 minutes. That is all. It took us to run from Wadsworth to the place where the accident occurred, about two and one-half hours, and out of that time I was only on the engine 15 minutes. At the time Johnson attempted to, or did, start the injector, we had then passed over Brown's hill. At the time I saw Johnson go out on his running board we had then passed over Brown's hill, and were on the eastern slope. I saw him walk along the running board to the check valve with a hammer or monkey wrench. Q. You saw him slipping his hand on the rail? A. I did not see the motion of his hand, but I saw his arm extended. Q. Did you see him tap the check? A. Yes, sir; I did. Q. Did you hear the tapping? A. I could not hear anything. Q. Are you sure you did not hear the tapping? A. Pretty sure; yes, sir. Q. Did you ever state that you did hear it? A. I do not think I ever did. I know what you refer to,—my interview with Mr. Whitehead. I was not under oath then. Q. Do you admit now that you did say to Mr. Whitehead and myself that you did hear the tapping of the hammer? A. I make no such admittance. After I saw him tap the valve, I saw him stand up. When he was in the act of tapping the valve, he was stooping over. He stood over this way (showing), with his hand on the rail, and I think his knee was on the running board. I saw him strike this way (showing), and then I saw him stand up, and that was the last time I saw him on the running board. When he was standing up, his back was towards the cab. He

had not turned around. It is not customary for firemen or engineers, after they have gone out on the running board, to walk backward to the cab. They turn around and face the cab; at least, I always do. I could not say that others always do. They may have different methods. If Mr. Johnson had attempted to face the cab, he would have to let go the rail with his left hand, most likely. I should think he would put his right hand on the rail before he let go with his left. I did not see any movement of that character, because I was looking another way. The next I saw of him was when he was on the ground. I did not see Johnson start the injector. It was working when I got into the cab. I saw him reach over, and I think I saw him shut it off. Then it was that I observed the steam and hot water coming into the cab, and then I saw him start out on the running board. There is a way by which the steam can be prevented from coming back into the cab other than by seating the valve by going out and knocking it down. A man could shut down the frost cock. That is a small valve on the injector pipe about three inches from the injector. I think that can be used to stop it, but I never saw it used to stop it, and I never used it myself. I never had occasion to use it for that purpose. I do not know, in this instance, whether Johnson attempted anything of the sort or not. I do not know how much water was in the glass, but I think it was low. I almost always look at the water in the glass, but I do not remember whether my attention was called to it or not on this occasion. I have no recollection of looking at the glass. Yes, I have a recollection, but I do not remember the amount in the glass. I have run an engine six months, which was a similar engine to those on this line. If, in this particular engine, there was from one to one and one-half inches of water in the glass; going down hill, and the steam was shut off, and the engine was 'running without power,' the distance it would rock with that amount of water would depend upon circumstances. I understand the circumstances as shown in this case. Under these circumstances, with from one to one and one-half inches of water in the glass, I should judge it would roll a very short distance; possibly a mile. It might have been possible to run to Brown's, but I would not want to take the chances. I do not know positively that it would not have run six miles, but it would not run six miles under those circumstances. There would be water consumed by the fires, and one thing or another. If, however, they had used this appliance I speak about, and shut the steam off from coming into the cab, it would probably have burst the injector pipes. I think it possible."

The rules of the company referred to in the testimony are as follows:

"Southern Pacific Company (Pacific System) Rules and Regulations for the Government of Employés of the Operating Department. To Take Effect July 1, 1892, at 12:01 A. M.

"General Notice.

"It is of the utmost importance that proper rules for the government of employés of this company should be literally and absolutely enforced, in order to make such rules efficient. If they cannot or ought not to be enforced, they ought not to exist. Officers or employés whose duty it may be to make or enforce rules, however temporary or unimportant they may seem, should keep this clearly in mind. If, in the judgment of any one whose duty it is to enforce a rule, such rule cannot or ought not to be enforced, he should at once bring it to the attention of those in authority. All persons entering or remaining in the service of this company are warned that their occupation is hazardous; that they do so with a full knowledge of the dangers incident to the operating of railroads; that in accepting or retaining employment they must assume the ordinary risks attending it; that they are required to exercise great care in the performance of their duties to prevent accident to themselves or others; and before using tools or apparatus of any kind, they should know that they are in a safe condition to perform the service required, and report to the superintendent, in writing, defects in tracks, cars, machinery, and appliances of any kind, liable to cause accidents. The company does not wish or expect its employés to incur any risk whatever, from which, by the exercise of their own judgment and by personal care, they can protect themselves, but enjoins upon them to take time in all cases to do their duty in safety, whether

they may be, at the time, acting under the orders of superiors or not. In dealing with the public, especially with the company's patrons, it is often necessary that employés should observe much patience and self-restraint, always endeavoring to follow the dictates of good sense and prudence, in order to make the most favorable impression, and treating them as any good business man would treat his customers, with the view of making the road popular.

"Approved:

"A. N. Towne, Gen. Manager.        J. A. Filmore, Gen. Supt."

"Train Rules: (121) In all cases of doubt or uncertainty, take the safe course, and run no risks."

The second and third subdivisions of rule 213 are as follows: "Every employé is required to exercise the utmost caution to avoid injury to himself or to others, especially in the switching or other movement of trains." "No person who is careless of the safety of himself or of others will be continued in the service of the company."

William F. Herrin, E. S. Pillsbury, and G. W. Baker, for plaintiff in error.

Robert M. Clarke, for defendant in error.

Before McKENNA and GILBERT, Circuit Judges, and MORROW, District Judge.

After stating the case, McKENNA, Circuit Judge, delivered the following opinion:

The determination of the correctness of the ruling of the court refusing the motion of defendant (plaintiff in error here) requires a consideration of the testimony and its probative force. It is clear, conceding to the latter the highest degree to which, by the laws of evidence, it was entitled, if it failed to warrant a verdict for the plaintiff, it was the duty of the court to so have instructed the jury. Pleasants v. Fant, 22 Wall. 116; Southern Pac. Co. v. Hamilton, 4 C. C. A. 441, 54 Fed. 468. Or the rule is sometimes stated as follows:

"It is only when the facts are undisputed, and are such that reasonable men can fairly draw but one conclusion from them, that the question of negligence is ever considered one of law for the court." Railroad Co. v. Peterson, 12 U. S. App. 259, 5 C. C. A. 338, 55 Fed. 940; Kenna v. Railway Co., 101 Cal. 26, 35 Pac. 332; Railway Co. v. Cox, 145 U. S. 606, 12 Sup. Ct. 905.

The allegation of the complaint is:

"(9) That on the 14th day of August, 1892, said deceased, Horace M. Johnson, was a locomotive engineer employed by the defendant, Southern Pacific Railroad Company, on one of its engines, and was in the proper and necessary discharge of his duty as an engineer in running an engine, and on said day, through the willful carelessness and negligence of the said defendant, Southern Pacific Company, in failing and neglecting to keep its engine in repair, and without any carelessness, negligence, or fault of the said Horace M. Johnson, and by reason of defects in the said engine, of which defects defendant had notice, and which it was its duty to repair, and which defects it knowingly permitted to exist, the said Horace M. Johnson was thrown from the said engine, which he was at the time operating as engineer for the said defendant, and was mortally injured, of which mortal injury the said Horace M. Johnson afterwards, and on the 20th day of August, 1892, died, to the injury of plaintiff, and of the said Eliza M. Johnson, Edith Maud Johnson, Gertrude Madge Johnson, Horace Glenn Johnson, and Rodney Laurence Johnson, and to their damage in the sum of twenty-five thousand dollars."

This allegation contains three propositions: (1) That there were defects in the engine of which plaintiff in error had notice; (2) that it failed and neglected to repair them; (3) that, by reason of such defect, Johnson lost his life, without his fault or negligence. For the purposes of the case we shall assume that the evidence establishes the first two propositions, and we shall only consider what truth there is of the third, which involves the counter proposition, was he guilty of contributory negligence? This court held in Railroad Co. v. Charless, 2 C. C. A. 380, 51 Fed. 562, reviewing the prominent cases, that it was the duty of an employer to supply and maintain suitable instrumentalities for the performance by his employés of the work required of them, and that responsibility could not be be avoided by charging the neglect to other employés. But this duty does not exempt the employé from care and prudence. In Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, cited in Railroad Co. v. Charless, supra, the action was by a brakeman for injuries received. Contributory negligence was charged. The court, by Mr. Justice Field, said on page 655, 116 U. S., and page 590, 6 Sup. Ct.:

"As to the alleged negligence of the plaintiff, only a few words need be said. Of course, he was bound to exercise care to avoid injuries to himself. If he had known, or might have known by ordinary attention, the condition of the brakes and cars when he mounted the cars, and thus exposed himself to danger,—in other words, if he did not use his senses as men generally use theirs to keep from harm,—he cannot complain of the injury which he suffered."

The rule of law is tersely and comprehensively stated by the learned judge who tried the case in the circuit court, as follows:

"Personal negligence is the gist of the action. It must therefore appear, to render the defendant liable, that it knew, or from the nature of the case ought to have known, of the unfitness and unsafe condition of the engine and machinery, and that the employé did not know, or could not reasonably be held to have known, of the defect. Knowledge on the part of the defendant and ignorance on the part of deceased are of the essence of the action."

In Malone v. Hawley, 46 Cal. 413, the supreme court of California held that the liability of a defendant in a case like the one at bar depended upon three facts: (1) That the instrument or machine was defective, and that the injury was caused by the defect; (2) that the defendant knew, or ought to have known, of the defect; and (3) that the plaintiff did not know, and had not equal means of knowledge. There are many other cases to the same effect, but which we need not review, nor the cases modifying the rule and holding the master liable, notwithstanding the servant knew of the defect, if he was induced to continue his work by a promise that the defect would be remedied. See 2 Thomp. Neg. pp. 985, 1008, et seq., where the cases are collected. Assuming, as we have assumed, the existence of the defects and the company's knowledge of them; conceding that the deceased was justified in continuing in employment, —the question still remains, was he or was he not culpable, under the circumstances, in going out on the running board? The plaintiff in error is only liable if Johnson's death was caused by the defects

in the engine. It certainly was not caused by the defects in the injector alone. They were, it is true, the occasion of his going out on the running board; but going on the running board was not of itself hazardous to railroad men, and only became so, if at all, by the other defects in the engine. If these, however, made it so, it was surely apparent to Johnson, and he should not have risked it. He was a skilled engineer, and, besides, had had months of experience with the engine, including the day preceding the accident. We know from the testimony of Driscoll, supra, that for at least 15 minutes before the accident (all of the time he was on the engine) she swayed and rocked. Maybe she had done so for two hours before. And Freeman testified: "There was considerable jarring." If this rendered the running board dangerous to any one, Johnson was guilty of reckless negligence to go out on it. There was no emergency which demanded the risk. The train was running, the fireman said, 18 miles an hour. Its speed could easily have been slackened by an application of the air brakes. It could have been stopped as it was stopped by Driscoll immediately after the accident; and surely this inconvenience cannot be offset against and justify his assuming a dangerous risk to his life. Besides, the rules of the company enjoined him, in such situation, to take no risks. If the testimony shows that the risk was not obvious, it also shows that danger could have been avoided by care. Driscoll testified, in addition to what has been quoted supra:

"It was not so rough that the engineer could hardly keep his seat, but I never was on an engine that jarred as much as this one. It would not jar a man so that he would be likely to slip off his seat. If he was in the cab, he could not. I did not say that jarring motion was sufficient to throw a man off the running board. Q. Why won't you say it? Is it because you do not know? Do you mean this,—that the up and down motion or the jarring motion that constituted it a rough-riding engine would be sufficient to throw a man off the running board if he had his hand on the hand rail? A. I do not think it would if he had his hand on the hand rail. Q. Your experience is that engineers don't very often go out on the running board without keeping their hand on the hand rail? A. Yes, sir; as soon as they can get it on there. Q. Then you do not conclude that the jarring you have described, if the engineer had his hand on the hand rail, would be sufficient to throw him off if he was exercising any care? A. If he had his hand on the hand rail, I do not think it would. I would not go out without having my hand on the rail."

And Charles Short, also a witness for the defendant in error, and who succeeded Johnson as engineer about one hour after the accident, and ran the engine that day about 100 miles, testified:

"Between Brown's and Winnemucca the right injector check stuck up frequently,—8 or 10 times, perhaps. To remedy it, the fireman went out over the running board, and I went out and tapped it down."

Neither the condition of the engine, its swaying or rocking or jarring, nor the fate of Johnson deterred him or his fireman (and the latter had seen the accident to Johnson) from going out over the running board to the injector valve, or prevented it from being safely done when care was used. It was suggested on the argument by counsel for defendant in error that the engine may have suddenly lurched, breaking Johnson's hold on the rail; but there is no evi-

dence of this, and the condition of the road seems to preclude it. Describing the road, Freeman testified:

"The hill slopes slightly towards Brown's, the greater part towards Wadsworth. The locomotive was on the eastern slope going towards the Humbolt. There are several small curves in the road at that place. Q. Where, with respect to these curves, did the accident take place? A. It was a straight track where the accident took place. Q. Were there any sags? A. No, sir; the character of the grade is not very steep."

And Driscoll testified that:

"The road at the place of the accident had some slight curves, but I do not think there were any sags on the line where this accident occurred."

Neither witness testified to a sudden lurching of the engine. Whatever its motion, it seems to have been constant and uniform, and it appears impossible for a sudden lurching to have occurred, violent enough to wrench the hand of the deceased from the rail, and it not have been noticed by either Freeman or Driscoll. If the injury could have been avoided by care, defendant is not liable. Railroad Co. v. Baugh, 149 U. S. 390, 13 Sup. Ct. 914, and cases cited. We think that the circuit court should have instructed the jury as requested by the plaintiff in error, and its judgment, therefore, is reversed, and the cause remanded for a new trial.