SOUTHERN PAC. CO. v. HAMILTON.

(Circuit Court of Appeals, Ninth Circuit.    January 30, 1893.)

No. 48.

1. TRIAL—MOTION TO INSTRUCT FOR DEFENDANT—WAIVER OF OBJECTIONS.
   Where a defendant, at the close of plaintiff's testimony, moves for an instruction to the jury to find in his favor, and the court denies the motion, the subsequent introduction of testimony by defendant waives all objections which he might have made to the ruling. Railroad Co. v. Hawthorne, 12 Sup. Ct. Rep. 591, 144 U. S. 202, followed.

2. CARRIERS—EJECTMENT OF PASSENGERS BY CONSTABLE.
   A passenger refused to sign his railway ticket, thus violating its provisions, and rendering it void, and drew a pistol to resist an effort on the part of the conductor to eject him. He was afterwards arrested, on complaint of the railway company, and removed from the train, by a constable, who after such removal kept him in irons for 20 minutes before procuring a warrant. The passenger was acquitted in a criminal prosecution wherein the railway company's agent swore to the complaint. In a suit by the passenger against the company the constable testified that he acted merely as a peace officer, and on information that a pistol had been drawn. Held, that an instructon that, if the company caused the arrest merely to eject the passenger from the train, the constable was its special agent for that purpose, for whose unnecessary violence the company would be responsible, was erroneous, since it failed to discriminate betwen the acts of the officer while removing the passenger, and afterwards; and where such passenger, having suffered no great bodily harm, recovers $44,000 for his injuries, the verdict, although reduced by the trial judge to $15,000, should be set aside, as influenced by the erroneous instruction, and a new trial ordered.

3. NEW TRIAL—VERDICT AGAINST EVIDENCE.
   Where the evidence offered for the party for whom a verdict is rendered, conceding to it the greatest probative force to which, according to

the law of evidence, it is fairly entitled, is insufficient to support the verdict, the court should set aside the verdict, and grant a new trial. Pleasants v. Fant, 22 Wall. 120, followed.

4. EXCEPTIONS—BILL OF—WHEN AND HOW TAKEN.

Where a party's exceptions are reduced to form, and filed with the clerk at the trial, before the jury retires, and a formal bill of exceptions, filed within the time granted by the court, is afterwards settled and approved by the court as containing a correct statement of the case, the writ of error should not be dismissed because of a failure to comply with the rules of the trial court, for such court may suspend its rules, or except a particular case from them, to subserve the ends of justice. U. S. v. Breitling, 20 How. 252, followed.

In Error to the Circuit Court of the United States for the District of Nevada.

Action in the district court of Humboldt county, Nev., by Asa M. Hamilton against the Southern Pacific Company to recover for injuries inflicted in ejecting plaintiff from defendant's train. Defendant removed the cause to the federal circuit court, where judgment was given for plaintiff. Defendant brings error. Reversed.

Baker, Wines & Dorsey, for plaintiff in error.

J. H. Macmillan, (William Woodburn on the brief,) for defendant in error.

Before McKENNA and GILBERT, Circuit Judges, and KNOWLES, District Judge.

McKENNA, Circuit Judge. The defendant in error, Hamilton, purchased in Denver, of a broker, a first-class, unlimited ticket for San Diego, via San Francisco. The broker was not an agent of either of the companies over whose lines the ticket purported to be good for a passage. It was primarily issued by the Union Pacific Railroad Company, and was what is called a "Contract Ticket," which is explained as one issued for a continuous passage over two or more roads, as distinguished from a ticket issued by one road, and confined to it, the former only being good in the hands of the original holder, when attested by his signature, and the latter good in the hands of any holder, being transferable. There was a distinction made in the case between limited and unlimited tickets; the distinction, however, being one only of time; the latter being good until used. The ticket purchased by Hamilton had printed on it the following conditions, among others:

"(3) * * * If presented by any person other than the original holder, this ticket is void, and conductor will take up, and collect full fare. * * *
(6) The holder will write his or her signature when required by conductors or agents."

Immediately above the space marked for the signature of the holder are the following words:

"I hereby agree to all the conditions of the above contract.'

The ticket was in the form adopted by the companies, and the enforcement of the condition requiring the signature of the holder by conductors or agents was necessary to enable the company who

accepted it, if other than the issuing company, to collect its share of passage money from the issuing company.

In regard to these conditions the court below held, and instructed the jury:

"That railroad companies have the right to adopt and enforce reasonable rules and regulations for the safe, convenient, and orderly conduct of their business. * * * If the holder of a valid railroad ticket refuses to comply with any reasonable rule or regulation, * * * when requested so to do by the agents or conductors of such company, the company has the right to eject him from the cars, using only such moderate force as may be necessary to secure his removal. You are instructed that the defendant, the Southern Pacific Company, and the Union Pacific Company, had the right to adopt the form of ticket to be sold and used over each other's lines, and that in selling the ticket in question the Union Pacific Company acted as special agent of the defendant, and the defendant was not bound to honor the ticket unless it was in the form, and issued in the manner, agreed upon by both parties, or by the defendant. In purchasing a ticket from a person who was not an agent of the railroad company, the plaintiff was bound to examine the ticket, to see if it was genuine, and to read the conditions printed thereon, and would be bound by the reasonable conditions and rules so printed. The fact that the ticket was purchased from a ticket broker, who was not authorized by the railroad company (defendant) to sell the same, does not confer upon the purchaser any greater right or privilege than if he had purchased a ticket from a regular or special agent of the railroad company."

### And, construing the ticket, the court further said:

"So far as this ticket is concerned, it is a first-class, unlimited ticket, subject to the conditions which are printed on its face. The third,—and this is most material: 'If not so used, and if more than one date is canceled, or if presented by any person other than the original holder, this ticket is void, and conductor will take up and collect full fare.' That applies to the ticket in either form. If the ticket was used as a second-class or a limited ticket, and if more than one date is canceled, it would apply to certain conditions of the ticket; or, 'if presented by any person other than the original holder, this ticket is void, and conductor will take up and collect full fare.' That applies to the whole ticket. * * * The next condition is: 'The holder will write his or her signature when required by conductor or agent.' Then there is another clause which has not been referred to, and has no bearing. This ticket, you will notice, bears upon its face, first, a blank space, and then the word, 'Signature,' and it is signed by the agent of the Union Pacific Company. I instruct you that the testimony in this case is that that form of ticket was adopted by the two companies, and that they were required, in order to make that ticket good over other lines than their own,—the party selling it must require the purchaser to attach his signature. And, if he accepted the ticket without signing it, he, nevertheless, would be bound by that rule when he reached the line of the defendant company. It necessarily follows from what I have already said that the ticket which was presented by Hamilton at Ogden was not such a ticket as defendant, the Southern Pacific Company, was bound to honor. And if you believe that the agents of the company, at the time he went upon their train, notified him that the ticket, in that form, was not such as they were entitled to honor, and that unless he signed his name he would not be allowed to travel upon it, or, in other words, that he would have trouble with the conductor, the conductor had the right to request him, on the presentation of that ticket, to sign his name. That was the only objection made to it. If, he had signed his name, the testimony is that he would have been allowed to travel upon that ticket as a first-class, unlimited ticket. If he refused to sign his name, pay his fare, or leave the train, then the conductors or agents of the defendant had the right to use as much force as was necessary, and no more, in order to remove him from the train."

These instructions state the law clearly and correctly, and the plaintiff in error finds no fault with them, but urges that the

court erred in refusing, at the close of the plaintiff's testimony, to instruct the jury on its motion to find a verdict for it, and again erred by submitting to the jury, as a mixed question of law and fact, the agency and circumstances of the plaintiff's removal from the train.

The first error claimed, however, was waived by defendant, by introducing testimony. To have availed itself of it, it should have rested its case. Railroad Co. v. Hawthorne, 144 U. S. 202, 12 Sup. Ct. Rep. 591, and cases cited.

To pass on to the second claim of error, needs a consideration of the testimony. The plaintiff was removed from the train at a town called Lovelocks, in the state of Nevada, by a constable acting on complaint of an agent of defendant; and if there is any evidence that the officer acted as agent of the company, in the sense stated in the instruction, the instruction must be sustained. The rule in an appellate court is stated by Justice Lamar in Insurance Co. v. Ward, 140 U. S. 91, 11 Sup. Ct. Rep. 720: "We have no concern" the learned justice said, "with questions of fact, or the weight to be given to the evidence which was properly admitted," citing a number of cases. But in Pleasants v. Fant, 22 Wall. 120, et seq. the court say, (Justice Miller rendering the decision:)

"That in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any, upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. * * * It is the duty of a court, in its relation to the jury, to protect parties from unjust verdicts, arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial. This is done by making plain to them the issues they are to try, by admitting only such evidence as in proper in these issues, and rejecting all else; by instructing them in rules of law by which that evidence is to be examined and applied; and finally, when necessary, by setting aside a verdict which is unsupported by evidence, or contrary to law. In the discharge of this duty it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor,—not whether, on all the evidence, the preponderating weight is in his favor, (that is the business of the jury,) but conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside, and grant a new trial."

The charge excepted to is as follows:

"A peace officer who, in response to the invitation of the regular agents of the company, assists in ejecting a passenger, becomes a special agent of the company for that purpose, and is subject to the same rule in regard to excessive violence in executing the regulations of the company. The question as to the cause of plaintiff's arrest at Lovelocks is a mixed question of law and fact. If the jury believe from the evidence, from a consideration of all the attendant and surrounding circumstances, as testified to by the various witnesses upon this trial, that the agents of defendant caused the arrest of plaintiff to be made by a peace officer at Lovelocks simply as a means to the end of ejecting or removing plaintiff from the car, on the ground that he had refused to sign his name, pay his fare, or leave the car, then such officer should be treated as a special agent of the defendant, for that purpose, and the defendant would be liable for his acts in the same manner, and to the same extent, as if the officer's acts had been committed by a regular agent of the defendant."

What is the evidence as to the officer's agency, and as to the force he used, and the defendant's connection with it? The court left no other issues to the jury. Under its instructions the defendant had a right to remove him. Its responsibility was only for the manner and degree of it, to be judged of by the circumstances. Hamilton got on the train at Denver. "I was then on my journey," he testified "to Portland, Or., but I had business in San Francisco, and that is the reason I went that way. * * * I had no idea of going to San Diego, but I travel a great deal, and may go to San Diego at any time, or to any other portion of the country." He thought the price of a ticket to San Francisco was the same as he paid for the ticket to San Diego. His baggage was checked to San Francisco. The conductors of the Union Pacific Railroad Company did not object to the ticket, but the agent of the Central Pacific notified him before he boarded the train that he would have to sign the ticket; and conductors of the train not only requested him to sign it, but importuned him,—indeed, coaxed him,—one offering to do it for him when he said he could not write, but desisted by threats of arrest for forgery; and one showed him a telegram from T. H. Goodman, general ticket agent at San Francisco, which read, "Use passenger as if he had no ticket." Indeed, he was treated with exemplary consideration and patience. He was allowed to ride from Ogden to Lovelocks, was not disturbed at night, and he says, up to the time of the struggle with Mr. Derbyshire, the conductors were gentlemanly to him. Finally, Derbyshire, who was the third conductor from Ogden, told him he was going to put him off, telling him to put on his shoes; he then having his slippers on. The conductor and a brakeman attempted to remove him, but his resistance defeated them, and the conductor sent for other train hands. The plaintiff drew his pistol from his valise, and climbed up on the back of the seat, between the curtain rail, he says, and the top of the car; threw his arm over the curtain rail, with the pistol pointing to the ceiling. The train men came to the door. "At that time," plaintiff further testified, "I had my gun pointed at the ceiling. I said: 'I don't want any of you men to bother me. I have a right here, and I want you to keep away from here, or probably you will get hurt. I have been worked up and bothered about this until I don't know, hardly, what I am doing. Now, keep away,'—or words to that effect. That is about what it meant, but may be not the exact words."

But it is not necessary to detail the testimony. It shows clearly, and there is no contradiction, that it was his duty to sign the ticket; that he was repeatedly requested to do so, the consequence of refusal being plainly stated to him; that, for illegal purposes of his own, he refused; that he resisted, by force, efforts to remove him, and intended to so resist, and finally exhibited a pistol, saying "that he intended to protect himself against any further bother from you folks,"—meaning the train hands; that he was excited. "They seemed to have worked him up," one witness said. And he so far impressed the passengers that one of the passengers said, "My wife made to run out, * * * and everybody made a break to run." He turned around, and said, further signifying his purpose, "You

need not get frightened. I am not going to hurt you. I know how to handle a pistol, and I am going to protect myself." There was no further effort made by the conductor or train hands to remove him, but the conductor telegraphed to Mr. Whitehead, the division superintendent at Wadsworth, "that a man had pulled a pistol on him,—a six shooter, he thinks he worded it,—and asked to have him taken off at Lovelocks." And Whitehead telegraphed to the agent at Lovelocks as follows: "Conductor Derbyshire, on No. 4, wires me that a man on his train has drawn a six shooter on him. Have an officer on hand when No. 4 arrives." The agent at Lovelocks either showed the telegram to an officer at Lovelocks, by the name of Couzzins, and who was called as a witness by plaintiff, or told him its contents. He testified he acted on account of it, as an officer, selecting one Tifner as an assistant. Tifner was not an employe of the company. He armed himself because Derbyshire told him the man was a little wild, and had a six shooter about a foot long. He found Hamilton in the smoker, and arrested him by putting the handcuffs over his right hand, and grabbing him by the left, and by telling him that he (the officer) wanted him. He threw up his hands, and said, "Mr. Sheriff, I make no resistance whatever."

This is the testimony, and if it does not bring the case within the opinion of the supreme court in Pleasants v. Fant, supra, it does not leave it far without it.

If not a trespasser from the beginning, the plaintiff became one when he refused to sign the ticket. He resisted removal, drew a pistol, and said he was "going to protect himself." Protect himself against what? Presumably, against signing the ticket which it was his duty to sign; protect himself against his removal from the train, which the company had a right to require. Was he in earnest, or was he pretending? It is not material which. When a man draws a pistol, he risks all the constructions of his acts. Whatever his purpose, he, at least, cannot complain if it be taken to be what he tries to make it seem. Plaintiff's purpose seemed lawless, and supported the supposition that he refrained from worse because the company, which was right, yielded to him, who was wrong. It is difficult to imagine what duty the company omitted, what more it could have done than it did do, unless it be held that its rights disappeared with the appearance of plaintiff's pistol, and that the pistol gave him a claim to ride which his ticket did not. The company had either to submit to his imposition, or oppose force to force, or appeal to an officer of the law. It chose the latter. Did it do wisely, considering what was in its trust and responsibility? Or would it have been wiser to have met the challenge of plaintiff's pistol by counter weapons, and risked a tragedy on its train, rather than risk a shock to his sensibilities by being handcuffed and taken off by a peace officer? Whatever answer the testimony may justify to these questions, it seems clear to me that the court was not justified in assuming that there was evidence to justify a finding that the officer acted as agent of the company, in the sense of the instruction, or in the sense it was capable of being understood. The officer was plaintiff's witness, and he

expressly testified that he acted as an officer only, and from the statement that plaintiff had drawn a pistol on the conductor, which plaintiff had done. I do not mean to say that the company may not be liable for the acts of the officer induced by it, but I think that in this action there should have been a more careful discrimination of his acts in removing plaintiff from the train from his acts afterwards, and it is impossible to resist the conclusion that the jury felt impelled by the instruction to confound the distinction. Its verdict, which was for $44,750, cannot otherwise be explained. The court reduced the amount to $15,000, but, of course, this did not correct the grounds upon which it was based. That could only have been done by a new trial. How important the distinction was between the officer's acts when he removed plaintiff from the train, and his acts afterwards, is obvious from the testimony. He kept the plaintiff in irons for 20 minutes after the train departed, from his own volition, formally arrested him afterwards on a warrant issued by a magistrate on a complaint made by the agent at Lovelocks, and detained him until he was released on bail. We do not think that the company is liable in this action for these acts of the officers of the state of Nevada, even though the company's agent swore to the complaint, or because plaintiff was acquitted.

The defendant in error claims that the writ of error in this case should be dismissed "because no bill of exceptions or statement, as required by the rules of the circuit court for the district of Nevada, in support of the motion for a new trial, was ever made or presented to the judge of said court within the time required by the rules of practice thereof, or was ever filed in said court, or settled, until after the motion of the plaintiff in error for new trial was heard and denied." But the exceptions of the defendant were reduced to form and filed with the clerk at the trial, and before the jury retired, and a formal bill of exceptions filed within the time granted by the court. It was afterwards settled and approved by the court as containing a correct statement of the case. Besides, it is within the power of the court to suspend its own rules, or to except a particular case from them, to subserve the purpose of justice. U. S. v. Breitling, 20 How. 252. See, also, Dredge v. Forsyth, 2 Black, 568, and Kellogg v. Forsyth, Id. 573.

Judgment is reversed and a new trial ordered.