## SOUTHERN PAC. CO. v. JOHNSON.

(Circuit Court of Appeals, Ninth Circuit. August 5, 1895.)

### No. 150.

1. PRACTICE—TIME FOR PRESENTING BILL OF EXCEPTIONS—RULES OF COURT.

Rules of court prescribing the time within which bills of exceptions must be presented or settled are rules of procedure, which may be dispensed with, in the discretion of the trial judge, provided the exceptions themselves are seasonably taken, and the bill of exceptions is presented at the same term at which the judgment is rendered; and the pendency of a motion for a new trial is good ground for the exercise of such discretion in permitting a bill of exceptions to be presented after the time limited by rule.

2. NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

The administratrix of one J., a locomotive engineer in the employ of the S. Ry. Co., sued that company for damages for the death of J.; alleging that it knowingly permitted defects to exist in the engine operated by J., by which he was thrown from the engine and mortally injured. It appeared upon the trial that J., at the time of his death, was running an engine with which he had been long familiar, and which was old and nearly worn out, and, in consequence, a "hard-running" engine, liable to jar and sway; that, while running at a speed of about 18 miles an hour, one of the injector valves stuck, and J. went out on the running board to close it; that such a difficulty with the valve was liable to occur on either a new or old engine, and that the course taken by J. to remedy it was the usual and proper one; that J. did close the valve, and started to return

to the cab, and, while returning, fell from the engine; that no special jar or jolt was noticed by either of three other men on the engine, sufficient to have thrown J. off if he was holding by the hand rail. *Held*, that the evidence was insufficient to establish negligence in the railway company.

8. SAME—RISKS OF EMPLOYMENT.
   *Held* further, that the risk attendant upon going out upon the running board to remedy the sticking of the valve which was liable to occur was one of the risks of his employment assumed by J.

Error to the Circuit Court of the United States for the District of Nevada.

Action by Eliza Ann Johnson, administratrix of the estate of Horace Johnson, deceased, against the Southern Pacific Company, to recover for the death of plaintiff's intestate, alleged to have been caused by defendant's negligence. There was a verdict for plaintiff (defendant in error), and defendant (plaintiff in error) brought this writ of error. Rehearing. Reversed.

Wm. F. Herrin, E. S. Pillsbury, and G. W. Baker, for plaintiff in error.

Robert M. Clarke and C. A. Jones, for defendant in error.

Before McKENNA and GILBERT, Circuit Judges, and MORROW, District Judge.

MORROW, District Judge. This case is now before the appellate court upon a rehearing granted February 28, 1895. The action was instituted in the circuit court for the district of Nevada by Eliza Ann Johnson, administratrix of the estate of Horace Johnson, deceased, against the Southern Pacific Company, to recover damages for the death of plaintiff's intestate, alleged to have been caused by defendant's negligence. Plaintiff (defendant in error here) recovered a verdict of $25,000, but consented to a reduction to $15,000, in lieu of a new trial. The defendant (plaintiff in error here) sued out this writ of error, and arguments were had, and the cause submitted for decision on April 10, 1894. The opinion upon that hearing was rendered November 5, 1894. The determination which the court then reached was that the verdict should be set aside, and the case remanded for a new trial, on the ground that the trial court had committed an error in refusing to grant the motion of plaintiff in error to instruct the jury to find a verdict in its favor for the reason that the evidence showed conclusively that the deceased had been guilty of contributory negligence. 12 C. C. A. 479, 64 Fed. 951. While the insufficiency of the evidence tending to show negligence on the part of the company was considered, the decision was based upon the question of contributory negligence. After a full and careful reconsideration of the case as presented upon the rehearing, we are still of the opinion that our ultimate conclusion, to grant a new trial, was correct; but we place our reasons for so holding, not upon the question of contributory negligence on the part of the deceased, but upon the insufficiency of the evidence, as contained in the bill of exceptions, to justify the court in submitting the case to the jury at all.

Before entering into a consideration of this question, there is a preliminary objection to be disposed of. The defendant in error in-

sisted at the former hearing that there was no proper bill of exceptions before this court. This was considered, but not noticed in the opinion, the objection being deemed not well founded. Inasmuch as this point has again been earnestly pressed upon the attention of the court, both in the petition for a rehearing and on the argument, we will briefly state the reasons which impel us to consider this objection to the bill of exceptions untenable. It is claimed that the bill of exceptions, and the errors assigned therein, should be disregarded, and the judgment affirmed, for the reason that the bill of exceptions was not served, and was not presented to the judge, or allowed, within the time provided by the rules of court, and because the exceptions were waived, and the bill of exceptions abandoned, by failure to present the same within the time required by the rules of court. Rules 23 and 25 of the circuit court for the district of Nevada are relied on to sustain this contention. Rule 23 provides that:

"All exceptions to the charge of the court to the jury shall be specified in writing immediately after the conclusion of the charge and handed to the court before the jury leave the box. The bill of exceptions must be prepared in form and presented to the judge within ten days after verdict, and in default thereof the exceptions will be deemed waived."

Rule 25 provides that:

"Where exceptions are taken or there is a demurrer to evidence, the party shall not be required to prepare at the trial his bill of exceptions, or demurrer or statement of evidence, but shall merely reduce such exceptions to writing, or make a minute of the demurrer to the evidence, as the case may be, and deliver it to the judge. The bill of demurrer shall, within ten days after the determination of the trial, be drawn up, filed, and a copy be served on the attorney of the adverse party, who, within five days thereafter, may prepare, serve and file amendments thereto; and in default thereof the right to propose amendments shall be deemed waived, in which case within five days thereafter the proposed bill may be presented by the moving party to the judge for allowance. * * * In all cases where a party proposing a bill of exceptions fails to present his bill, or bill and the proposed amendments, to the judge for allowance or settlement within the time limited as aforesaid, his bill of exceptions shall be deemed abandoned, and his right thereto waived."

The verdict was returned and judgment entered on June 17, 1893, which was during the March term. The bill of exceptions was not presented for allowance or settlement, nor was the same allowed or settled and certified to, until September 18, 1893,—90 days subsequent to the verdict and entry of judgment. These proceedings were, however, still within the March term of the circuit court for the district of Nevada, the court having but two terms during the year,—one beginning on the third Monday of March, and the other on the first Monday of November. 19 Stat. 4. No orders of court, or stipulations between the parties, extending the time within which to prepare and present the bill of exceptions, appear of record in the transcript. On June 24, 1893,—seven days subsequent to the verdict and judgment, —notice of a motion for a new trial was given by plaintiff in error. This, however, was not disposed of until September 18, 1893, when, as an alternative to the granting of a new trial, the defendant in error consented to a reduction of the verdict from $25,000 to $15,000.

According to the rules of the circuit court, above referred to, no further time having been granted by the court, or consented to by the parties, the time within which to file a bill of exceptions expired on June 27, 1893. By the strict terms of these rules, the bill of exceptions would be deemed to have been abandoned, and the right thereto waived. But adjudications in the supreme court of the United States and in the circuit court of appeals hold that rules of court fixing the time within which bills of exceptions are to be presented, allowed, or settled, and certified to by the trial judge, are merely directory. These decisions are to the effect that such rules do not control absolutely the action of the judge; that he is at liberty to depart from their terms, to subserve the ends of justice. U. S. v. Breitling (1857) 20 How. 254; Dredge v. Forsyth (1862) 2 Black, 568; Muller v. Ehlers (1875) 91 U. S. 249; Hunnicutt v. Peyton (1880) 102 U. S. 350; Chateaugay Ore & Iron Co., Petitioner (1888) 128 U. S. 544, 9 Sup. Ct. 150; Hume v. Bowie (1893) 148 U. S. 245, 13 Sup. Ct. 582. Such is the law of this circuit, as declared in the case of Southern Pac. Co. v. Hamilton, 4 C. C. A. 441, 54 Fed. 468, 474. In other words, these rules are regarded as rules of procedure, which may be dispensed with, in the discretion of the judge, provided, always, that the exceptions themselves are seasonably taken and reserved. As was tersely stated by the supreme court in Dredge v. Forsyth, supra:

"It is always allowable, if the exceptions be seasonably taken and reserved, that it may be drawn out in form, and sealed by the judge, afterwards; and the time within which it may be so drawn out and presented to the court must depend on the rules and practice of the court, and the judicial discretion of the presiding justice."

But it would seem that the exercise of this discretion is limited, under ordinary circumstances, to the same term in which judgment is rendered. Preble v. Bates, 40 Fed. 745. It cannot be done at a subsequent term, except, perhaps, under very extraordinary circumstances. See cases cited supra; also, Bank v. Eldred, 143 U. S. 293, 12 Sup. Ct. 450; U. S. v. Jones, 149 U. S. 262, 13 Sup. Ct. 840; Morse v. Anderson, 150 U. S. 156, 14 Sup. Ct. 43; Ward v. Cochran, 150 U. S. 597, 602, 14 Sup. Ct. 230; Railway Co. v. Russell, 9 C. C. A. 108, 60 Fed. 501; Miller v. Morgan, 14 C. C. A. 312, 67 Fed. 82. No such objection arises here, however, since the bill of exceptions was settled and certified to within the same term that the verdict and judgment were entered. The trial judge being empowered, according to the weight of authority, with a discretion as to when a bill of exceptions should be settled and certified to (so long as it is within the same term that judgment was entered, and, it would seem, under very extraordinary circumstances, beyond the term at which judgment has been rendered), the question which we are called upon to determine in this case is whether this discretion has been abused. We entertain no doubt that this question should be answered in the negative. There is not the slightest intimation that this discretion has been exercised to the detriment of the substantial rights of the parties. But, aside from the general and inherent power possessed by courts to suspend their own rules, or to except from their provisions a particular case, to subserve the ends

of justice, we think that the pendency of the motion for a new trial is a sufficient reason in this case why the action of the trial court in settling and certifying to the bill of exceptions should be sustained. It appears that the bill was settled and certified to on the day the court disposed of the motion for a new trial, viz. on September 18, 1893. The function of a bill of exceptions is to make a record for the appellate court. Black, Law Dict.; Bouv. Law Dict.; Yates v. Smith, 40 Cal. 669. Had the motion for a new trial prevailed, it is obvious that the labor of engrossing, settling, and certifying to the bill of exceptions would have been entirely useless. It was deferred until the motion for a new trial had been disposed of. Whether the mere pendency of a motion for a new trial operates, ipso facto, as an extension of time to prepare and have settled a bill of exceptions, it is not necessary to decide, but it was certainly a circumstance proper to be considered by the trial judge in the exercise of his discretion. The case of Woods v. Lindvall, 1 C. C. A. 34, 48 Fed. 73, is in point, although there the motion for a new trial was determined, and the bill of exceptions allowed and filed, at a term subsequent to the entry of judgment. In that case the verdict was returned on February 11, 1891, and on the same day judgment was entered on the verdict, according to the usual practice of that district. On the following day, pursuant to section 987, Rev. St. U. S., plaintiffs in error asked and obtained a stay of execution for 42 days, to enable them to file a petition for a new trial. During the January term, and within the 42 days, such petition for a new trial was filed, but the January term adjourned sine die before the motion was heard or determined. At the succeeding June term, 1891, the petition for a new trial was argued and overruled; and at the same term, to wit, July 30, 1891, a bill of exceptions was signed, sealed, and filed. The defendant in error duly objected to the allowance of the bill because the trial term had expired. It further appeared that no order had been entered at the January term, 1891, expressly extending the time for filing the bill to the June term, 1891, nor was any consent given that it might be so filed. Upon this state of facts, defendant in error made a motion to strike the bill of exceptions from the record, on the ground that it was not filed in time to become a part of the record. This was overruled by the circuit court of appeals. Judge Thayer, in the course of his opinion, said:

"Since the decision in Rutherford v. Insurance Co., 1 Fed. 456, we believe the practice has been uniform in all the districts of this circuit, where the custom prevails of entering judgment immediately on the rendition of verdict, to allow a bill of exceptions during the term at which the motion for a new trial is overruled, even though it happens to be a term subsequent to the entry of judgment. This practice, according to our observation, has become so common that it may be termed a rule of procedure in this circuit. It is a convenient practice. It obviates the necessity of settling a bill of exceptions at the trial term which is useless labor if a motion for a new trial is continued to and is sustained at, the succeeding term. And in these days, when it is customary to take notes of trial proceedings in shorthand, the practice in question is not open to those objections formerly urged against it. We are of the opinion, therefore, that the practice which has hitherto obtained in many districts of the circuit should be upheld unless it is over-

borne by controlling authority, and we find no such authority. On the contrary, we think the rule requiring bills of exception to be filed at the term when judgment is rendered must be understood to mean the term when the judgment becomes final, and, by reason of its becoming final, the court loses control of the record. It has been held several times that, if a motion for a new trial is duly filed by leave at the trial term, the judgment does not become final until such motion is determined. Rutherford v. Insurance Co., supra; Brown v. Evans, 8 Sawy. 502, 17 Fed. 912; Railway Co. v. Murphy, 111 U. S. 488, 4 Sup. Ct. 497; Brockett v. Brockett, 2 How. 238; Memphis v. Brown, 94 U. S. 716, 717; Slaughterhouse Cases, 10 Wall. 289."

It has been held, under a statute of the state of Missouri requiring all exceptions to be filed during the term at which they were taken, and all exceptions during the trial of a cause to be embraced in one bill, that the continuance of the motion for a new trial from the trial term to a succeeding term keeps the record open, prevents the judgment from becoming final, and enables the court to allow a bill of exceptions during the term at which the motion was finally determined. Riddlesbarger v. McDaniel, 38 Mo. 138; Henze v. Railroad Co., 71 Mo. 636, 644. In Bank v. Steinmitz, 65 Cal. 219, 3 Pac. 808, it appeared that the writ of error and bond for the removal of the cause from the state supreme court to the federal supreme court were not filed within 60 days after the judgment, as required by section 1007 of the Revised Statutes of the United States, but were filed within 60 days after the order denying the motion for a new trial. It was held that the motion for a new trial operated as a postponement of the time for filing the writ of error and bond until the disposition of that motion. We are not prepared to say that in this circuit the motion for a new trial has the effect declared in these cases, but we are of opinion that, under the circumstances of this case, the trial judge was fully justified in the discretion exercised by him, and that the bill of exceptions is now properly before the court.

Having disposed of this preliminary objection to the record, we will now proceed to consider the important question of this case, as raised by the first assignment of error, viz.: Did the trial court err in refusing to take the cause from the jury, or, in other words, was the evidence sufficient to justify the verdict of the jury? This inquiry necessarily involves a close scrutiny of the evidence. That this may, in its turn, be more clearly understood, let us briefly refer to the issues of the case: The action was brought under section 3898, Gen. St. Nev., which provides:

"Whenever the death of a person shall be caused by wrongful acts, neglect, or default, and the act, neglect, or default is such as would (if death had not ensued), have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured * * *."

The complaint alleges that:

"On the 14th day of August, 1892, said deceased, Horace M. Johnson, was a locomotive engineer employed by the defendant, Southern Pacific Railroad Company, on one of its engines, and was in the proper and necessary discharge of his duty as an engineer, in running the engine; and on said day, through the willful carelessness and negligence of the said defendant, Southern Pacific

Railroad Company, in failing and neglecting to keep its engines in repair, and without any carelessness, negligence, or fault of the said Horace M. Johnson, and by reason of defects in the said engine,—of which defects defendant had notice, and which it was its duty to repair, and which defects it knowingly permitted to exist,—the said Horace M. Johnson was thrown from the said engine, which he was at the time operating as engineer for the said defendant, and was mortally injured, of which mortal injury the said Horace M. Johnson afterwards, and on the 20th day of August, 1892, died," etc.

The answer denies that said Johnson met his death by or through any carelessness or negligence of the defendant; denies that the engine was out of repair, that defendant failed or neglected to keep the engine in repair, that it had notice that the engine was out of repair; and avers that Johnson met his death by and through his own carelessness and negligence in going out upon the running board of the engine.

The rule which should govern the action of the trial court in allowing or refusing the motion to direct the jury to give a verdict one way or the other is thus stated in Commissioners v. Clark, 94 U. S. 278, 284:

"Decided cases may be found where it is held that, if there is a scintilla of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule; to wit, that, before the cause is left to the jury, there is or may be in every case a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

And in Elliott v. Railroad Co., 150 U. S. 245, 14 Sup. Ct. 85, the following language is used:

"It is true that questions of negligence and contributory negligence are, ordinarily, questions of fact, to be passed upon by a jury; yet, when the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict returned in opposition to it, it may withdraw the case from the consideration of the jury, and direct a verdict."

The same doctrine was decisively settled, and very clearly stated, in Pleasants v. Fant, 22 Wall. 116. Justice Miller, in the course of his opinion, said:

"It is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether on all the evidence the preponderating weight is in his favor,—that is the business of the jury,—but conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court after a verdict to set it aside and grant a new trial. Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff that verdict would be set aside and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be, that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury."

Other cases announcing the same rule are Blount v. Railway Co., 9 C. C. A. 526, 61 Fed. 375; Railroad Co. v. Houston, 95 U. S. 697; Herbert v. Butler, 97 U. S. 319; Bowditch v. Boston, 101 U. S. 16; Griggs v. Houston, 104 U. S. 553; Montclair v. Dana, 107 U. S.

162, 2 Sup. Ct. 403; Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322; Schofield v. Railway Co., 114 U. S. 615, 5 Sup. Ct. 1125; Marshall v. Hubbard, 117 U. S. 415, 6 Sup. Ct. 806; Coyne v. Railway Co., 133 U. S. 370, 10 Sup. Ct. 382; Gunther v. Insurance Co., 134 U. S. 110, 10 Sup. Ct. 448; Railroad Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569; Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835; Meehan v. Valentine, 145 U. S. 611, 12 Sup. Ct. 972; Railroad Co. v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619,—and, in this circuit, Southern Pac. Co. v. Hamilton, 4 C. C. A. 441, 54 Fed. 468; Southern Pac. Co. v. Lafferty, 6 C. C. A. 474, 57 Fed. 536; Railway Co. v. Novak, 9 C. C. A. 629, 61 Fed. 573.

Keeping this rule in mind, let us examine the evidence tending to support the principal issues in the case. The circumstances leading to and attending the accident to Johnson are as follows: Johnson received an order on August 14, 1892, to take engine 1,266 and a freight train to Winnemucca. He left Wadsworth at about 6:30 in the morning of that day. On going down Brown's hill, about 35 miles from Wadsworth, he started the right-hand injector to prime some water into the boiler, it being then pretty low. It was necessary to work the injector for the purpose of throwing water into the boiler from the tank, in order to keep the boiler from burning. The injector is worked from the cab. Upon shutting it off, to give the fireman a chance to get up more steam, the injector check valve stuck, and steam and hot water poured from the boiler into the cab. Thereupon Johnson picked up an eight-inch monkey wrench, and went out of the cab, onto the running board, to tap down the right-hand injector check valve. This check is situated out on the side of the boiler, where the injecting pipe connects with it. Access to it is gained by means of the running board, which extends from the cab to about 1½ feet further than the check valve, and is about 7 to 10 inches wide. There is a hand rail fastened alongside the boiler. The train, at the time of the accident, was going on a down grade, impelled by its own momentum, at about 18 miles an hour. The track where the accident occurred was straight, with no sags. Johnson, as stated, went out on the running board, and tapped down the right-hand injector check valve, whereupon the water and steam ceased coming into the cab. After tapping down the check valve, and while in the act of returning to the cab, Johnson either fell or was thrown from his position on the running board, and was first seen, after his disappearance, doubled up, either just striking the ground, or else, having struck the ground, he was on the rebound. He subsequently died from the injuries sustained by the fall. There was no evidence tending to show how the deceased fell from the engine, or what caused him to be thrown from it. No one saw him fall from his place on the running board. The testimony tended to show that Johnson was a competent and experienced engineer, and that he had operated engine No. 1,266 from one to three years next preceding the accident; that this engine was old and worn out; that, as such, it was a hard-riding engine,—that is, it did not run smoothly, being liable to a jarring or swinging mo-

tion, known in railroad parlance as "lost motion." Freeman, the fireman, testified that:

"Engine No. 1,266, on the 14th day of August, 1892, was a hard-running engine. I think it would be from looseness of the engine. Continual wear, I should think, would make it loose,—I mean, wear of the boxes. The boxes were loose, and the cylinders were loose, and there would be a continual pounding and jarring. There was more or less swinging motion in cab and locomotive, occasioned by this looseness. At the time of the accident, as the engine was going down Brown's hill, there was considerable jarring. It was a hard-running engine."

This testimony was fully corroborated by other witnesses. It also further appeared that six days after the accident to Johnson the engine broke down completely, and had to be pulled into the shops for repairs; that within two months after Johnson's death it was taken to Sacramento for general repairs; that its condition then was such that it had to be hauled as a load.

It was claimed by defendant in error that the deceased was thrown from the engine by the jarring of the engine, and the jury were asked to draw that inference from the fact that the engine was old and worn out, and susceptible to "lost motion"; but the testimony of the only witnesses who were on the engine at the time of the accident does not justify this inference. Driscol, who was a brakeman on the train, and happened to be in the cab at the time of the accident, saw Johnson just a moment before the latter disappeared. He testified that he had been on the engine some 2 months previous to the accident, and had been in the cab some 15 minutes before the accident. His testimony as to the jarring was as follows:

"It was not so rough that the engineer could hardly keep his seat, but I never was on an engine that jarred as much as this one. It would not jar a man so much that he would be likely to slip off his seat. If he was in the cab, he could not. I did not say the jarring motion was sufficient to throw a man off the running board. Q. Why won't you say it? Is it because you do not know? Do you mean this: that the up and down motion, or the jarring motion, that constituted it a rough-riding engine, would be sufficient to throw a man off the running board if he had his hand on the hand rail? A. I do not think it would, if he had his hand on the hand rail. Q. Your experience is that engineers don't very often go out on the running board without keeping their hand on the hand rail? A. Yes, sir; as soon as they can get it on there. Q. Then you do not conclude that the jarring you have described, if the engineer had his hand on the hand rail, would be sufficient to throw him off, if he was exercising any care? A. If he had his hand on the hand rail, I do not think it would. I would not go out without having my hand on the rail."

L. S. Bell, also a brakeman, who happened to be on the engine at the time of the accident, testified to the swaying of the engine, as follows:

"I can tell pretty close to the place where Johnson fell off. At that place the road is straight. At the time, just before I knew that Johnson had fallen off, as near as I can remember, we were going down hill, without steam. There was no violent motion of the locomotive to the right and left, nor was there at any time when I was sitting in the position I have described. I saw Johnson go through the window. There was no peculiar motion or violent motion of the locomotive at the time I remember seeing him go out. The motion was not such as to render it unsafe for me to sit where I was sitting. I had my foot braced against the cab. I was sitting on a seat about

one and one-half to two feet long. There were no supports upon the left or right. My seat was just as if I was sitting on that desk. My feet were on the cab, and I was sitting on the tender."

The testimony of Freeman, the fireman, that "there was considerable jarring," has already been referred to; but it should be observed that that witness nowhere makes the statement that the jarring or swinging motion, whatever may have been its nature, was sufficiently violent to wrench Johnson's hand from the hand rail.

The use of the injectors is to convey water from the tank into the boiler. There is one on each side of the engine. The injector check valves are, as stated, out on the side of the boiler where the injecting pipe connects with them, which is near the end of the running board. These valves are worked from the cab by means of the injectors, and are known as "round-cup valves." The process of operation is as follows: When the injector is started in the cab, the velocity of the water rushing from the tank into the boiler raises this check valve. While the injector is kept working the check valve remains up,—kept thus by the force of the water. When the injector is shut off, and water ceases entering the boiler, the check should reseat itself. If it does not, then it would be stuck. An engineer would know whether a check is stuck by the escaping of steam into the cab through the overflow pipes. When this occurs the usual and customary practice among engineers, as testified to, is to go out on the running board, while the train is in motion, and tap down the check with a hammer, or, as was used in this case, a monkey wrench. This is the most convenient and ordinary method of remedying the sticking of the check valve, and arresting the flow of hot steam into the cab. It could also be done by stopping the train, and then going out on the running board and tapping down the check. Or the "frost cock" could be used. This last, however, seems to be seldom resorted to, for it would only result in preventing the hot steam from escaping into the cab. It would not cause the check to reseat itself. The causes which conduce to the sticking of check valves are either cinders, or scales from off the boiler, or some other foreign particle in the water getting into the check valve; or it may be that the check is too close-fitting in its cage; or, again, it may be defective and worn out. It is not an uncommon thing for checks to stick. It is as likely to occur to a new and smooth-working engine as to an old and worn-out one, in the condition of engine 1,266. The most frequent and likely cause is the presence of some cinder, or other small particle. This cannot be foreseen,—may happen at any time; and the only way in which one can detect whether the check will stick, or not, is by working the injector. So far as the right-hand check valve, in this case, was concerned, the evidence tended to show that it was somewhat worn, reduced in size, and that a washer had been placed on top of it to fill up the vacant space; that Johnson had reported on July 26, 1892, in the regular book kept in the roundhouse at Wadsworth for the purposes of reporting need of repairs to engines, that the right-hand injector check valve needed repairing. Freeman, the fireman, testified that the check was overhauled after it had been

reported by Johnson, which was 10 to 15 days before the accident, according to that witness' recollection. In subsequent reports made by Johnson,—viz. on July 30th, August 5th, 6th, 10th, and 13th, he makes no mention of the injector check valve,—but refers to the other defects, not connected with the injectors. It is claimed by the defendant in error that Johnson made a report on August 13, 1892,—the day preceding the accident,—as to the particular defect in the working of the injectors, and that this report was made in the regular report book kept by the company in the roundhouse for that purpose. The book purporting to contain reports from August 10th to August 18th was produced, and it was sought to show that a report between the one dated "August 13th, 1892," signed "Shipley," and the one dated "August 13th, 1892," signed "Marshall," had been torn out. There was a piece of paper where it was claimed a page had been extracted, about one-fourth of an inch in width, the lower edge of which was ragged. This piece of paper is of the same color and texture as the pages immediately preceding and following it, and is bound into the book. It was contended that a page had been torn out, so that its contents might not be disclosed at the trial. But, assuming that a page of the report book has been destroyed, there is an entire absence of evidence as to what it contained. The principle of the maxim, "Omnia præsumuntur in odium spoliatoris," as applicable to the destruction or suppression of a written instrument, is that such destruction or suppression raises a presumption that the document would, if produced, militate against the party destroying or suppressing it. This presumption, however, will not suffice to establish the contents of such document, without proper secondary evidence. It is only when this secondary evidence is weak and vague that the presumption takes effect. Bott v. Wood, 56 Miss. 140; Insurance Co. v. Evans, 9 Md. 1. But whether Johnson did, or did not, on the 13th of August, 1892, make a report as to defects in the right-hand check valve, becomes immaterial, in the view we take of the insufficiency of the evidence tending to show how Johnson met his fatal injury, or the proximate cause thereof.

This résumé of the evidence, though stated briefly and in general terms, will serve to show the nature of the case presented to the jury, upon which the negligence of the company is sought to be predicated. The allegation of the complaint is that the deceased was thrown from the engine by reason of defects in the engine, of which defects the company had notice, and which it was its duty to repair, and which it failed to do. We are met at the very threshold of this inquiry by the question, what were those defects? Was it the sticking of the check valve, or was it some other defect? And were such defects the proximate cause of the fall, and fatal injury to the deceased? The answer to these inquiries must come from the evidence alone, and, obviously, cannot be supplied by conjecture or surmise. How the deceased fell from the running board—what caused him to fall—was not shown. None of the witnesses saw him disappear. Johnson, when last seen by the witness Driscol, was in the act of returning, or just

about to return, to the cab. He had accomplished the object which had induced him to go out. He had tapped down the check valve, for steam and hot water ceased coming into the cab. It is therefore clear that the act of tapping down the check valve —even conceding that it was defective, and that the company knew of this, and failed to remedy it—could not have had anything to do with Johnson's fall, since it appears affirmatively that he had already done that. But it is urged that, if the right-hand injector check valve had not stuck, Johnson would not have had to go out and incur the risk he encountered. It is true that the sticking of the check valve was the occasion of Johnson's going out on the running board. It might even be said that it was necessary to do so, in order to prevent the further escape of steam into the cab. But it must, nevertheless, have been the proximate cause of deceased's fall. "Causa proxima, non remota, lex spectatur." Kent, Comm. 302; Railway Co. v. Kellogg, 94 U. S. 469. The bare fact that the check stuck, causing Johnson to go out on the running board, is not, of itself, sufficient to charge the company with negligence; especially so in view of the uncontradicted testimony that that will happen to any engine, whether it be new or old, and that the most frequent cause is the unavoidable and unforeseen presence of cinders or other small particles in the check valve. But assuming that the evidence satisfactorily establishes the fact that the check valve failed to seat itself because of a defect in its mechanism or working, due to the company's negligence, we are no nearer to a solution of the vexed question as to how this defect caused Johnson to be thrown off the engine. Indeed, so far as the facts of this case are concerned, going out on the running board to tap down a defective check valve is fraught with no more danger or peril than it is to readjust one which has stuck on account of a cinder or particle of dirt. But it is claimed that Johnson may have lost his hold of the hand rail by reason of a sudden lurching of the engine. That the engine, in its then worn-out condition, was susceptible to a jarring or swinging motion, termed "lost motion," was clearly established. "It was a hard-riding engine." That this somewhat increased the risk of going out on the running board, by making it more difficult to hold on, is conceded. But the difficulty about this phase of the case is that none of the witnesses testify to any "sudden lurch," or to any jarring sufficiently violent to wrench Johnson's hand from the hand rail. It does not appear that at this particular time there was any more jarring, or that it was greater in point of force, than was usual or peculiar to this engine, and which Johnson, as its engineer, and by reason of his long experience and intimate acquaintance with its condition and movements, must have known, and was presumably accustomed to. While there were curves in the road over which they were running, it was testified that where the accident happened the track was straight, with no sags; that the engine was running on a down grade, impelled by its own momentum, at the rate of about 18 miles an hour. That the act of going out on the running board was deemed usual and

proper, even on an engine in the condition in which No. 1,266 was, is evidenced by the fact that the fireman, Freeman, went out on the running board, soon after the accident, to tap down this same check valve. The two engineers who subsequently had charge of the engine did the same. Johnson's fate does not seem to have deterred them, nor, so far as the evidence discloses, did they experience any difficulty, or consider that they were doing anything unusual or perilous. The fact that the general condition of the engine was old and worn out; that she was a hard-riding locomotive; that her right-hand injector check valve was defective,— these facts do not, of themselves, make out a case against the company. There must be some evidence tending to show, or from which a reasonable inference can be drawn to justify submitting the case to the jury, that the injury proceeded proximately from some defect in the condition of the locomotive, whether it be the jarring, or some other cause. And it must further be shown, in this case, that the deceased was thrown from the engine by reason of such defect, which the company knew of, and failed to repair. There is an entire absence of evidence as to how Johnson fell from the engine, and the cause of his fall is involved in uncertainty and doubt. That he was thrown from the running board by reason of the jarring of the locomotive is not the only and exclusive inference that the evidence is susceptible of, as counsel for defendant in error contends. If it were the only reasonable inference that could be drawn, it might then well be said that the question should have been submitted to the jury, to abide by their judgment and verdict. But whether the deceased fell from the engine by reason of his own negligence, or was thrown off, is uncertain. Even an appeal to conjecture, if such could supply the place of legitimate evidence, does not aid us, for several hypotheses present themselves. Johnson, in turning around to return to the cab, may have released his hand from the hand rail, or he may have slipped, or possibly, as suggested by counsel for the company, he may have become dizzy. If the hand rail or the foot board had been defective and given away, thereby precipitating Johnson to the ground, or had the check valve, by its defective operation, rendered either the hand rail or the foot board less secure than usual, manifestly, a different case would be presented for our consideration; but the fact, under the evidence of this case, that the deceased was injured by a fall from the running board, is not sufficient to impute negligence to the company. The general rule being that negligence cannot be presumed from the fact of the injury, though it may be inferred from the facts proved, it, obviously, cannot be based on "guesses or conjecture." Redmond v. Lumber Co., 96 Mich. 545, 55 N. W. 1004. As was said in Short v. Railroad Co., 69 Miss. 848, 13 South. 826:

"The deceased was killed, and no one knows how. That is not enough to subject the railroad company to liability. Negligence must be shown."

In the case of Chandler v. Railroad Co., 159 Mass. 589, 35 N. E. 89, this language was employed, respecting the correctness of the

ruling of the trial judge in directing a verdict to be entered for the defendant:

"How the intestate came to his death, is purely a matter of conjecture. There is no evidence that the ladder down which he went was defective. Whether he fell from the ladder by reason of negligence on his part, or whether, without looking to see whether the coal car was in its place, he attempted to jump upon it, is uncertain. There is an entire absence of evidence as to how the intestate happened to fall to the ground, and it is not enough to show that one conjecture is more probable than another."

But, aside from the insufficiency of the evidence tending to show how or what caused Johnson's fall and fatal injury, there is another phase of this case which is equally conclusive against the right of defendant in error to recover, and that is upon the doctrine of assumption of risk. Considering the view we take of the insufficiency of the evidence to justify submitting the case to the jury, it will not be necessary to discuss this last proposition at any length. The act of Johnson in going out on the running board, while the train was in motion, to tap down the check valve, was incidental to the business of an engineer. It was "usual," "customary," and "necessary" to be done, according to the witnesses. It entered into the nature of his employment, and became one of the duties thereof, and he assumed the ordinary risks connected therewith. The general rule is well stated in the last edition (fourth) of Shear. & R. Neg.:

"A servant is held to assume the ordinary risks of the business upon which he enters, so far as those risks, at the time of his entering upon the business, are known to him, or should be readily discernible by a person of his age and capacity, in the exercise of ordinary care. But he does not assume any risks not thus known or discernible, nor any which do not exist at the time when he enters into his master's service, and to which his attention is not called before he suffers injury therefrom. These risks, moreover, must be inherent in the nature of the business, and must not arise from defects in the master's discharge of his personal duties." Section 185, p. 315.

But it is contended that, under the facts of this case, this act of Johnson was no longer an ordinary risk; that it became an extraordinary risk, on account of the condition of the engine, which rendered going out on the running board more hazardous, owing to the jarring or swinging motion. There are two difficulties which militate against this contention. In the first place, there is no evidence tending to show, or from which a reasonable inference can be deduced, that the increased risk contributed proximately to Johnson's fall. In the second place, Johnson, having been the engineer of this particular locomotive from one to three years previous to the accident, and being competent and experienced, must have known of the jarring or "lost motion" attending the movements of the engine,—he knew that it was a hard-riding engine; and he must have appreciated whatever increased hazard there was connected with the act of going out on the running board and tapping down the check valve while the engine was in motion, traveling at the rate of 18 miles an hour. It was not, therefore, an unknown or unseen peril. He went out with his eyes wide open to the exigencies of the situation. Having incurred the risk voluntarily, with full knowledge of the situation, the company cannot be held responsible. Their rules imposed care and caution upon his actions, and did not require him to place himself

in a position of unnecessary danger or peril, assuming that there was such. The law applicable to this proposition, and known as the doctrine of "Volenti non fit injuria," is thus stated very clearly in 2 Thomp. Neg. p. 1008:

"If the servant, before he enters the service, knows, or if he afterwards discovers, or if, by the exercise of ordinary observation and reasonable skill and diligence in his department of service, he may discover, that the building, premises, machine, or fellow servant in connection with which or with whom he is to labor is unsafe or unfit in any particular, and if, notwithstanding such knowledge or means of knowledge, he voluntarily enters into or continues in the employment, without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him."

In Buzzell v. Manufacturing Co., 48 Me. 113, it was tersely said:

"If the danger is known, and the servant chooses to remain, he assumes, it would seem, the risk, and cannot recover."

In Fitzgerald v. Paper Co., 155 Mass. 155, 29 N. E. 464, the following language is used:

"One who knows of the danger from the negligence of another, and understands and appreciates the risk therefrom, and voluntarily exposes himself to it, is precluded from recovering for an injury which results from the exposure. It has often been assumed that the conduct of the plaintiff in such a case shows conclusively that he is not in the exercise of due care. Sometimes it is said that the defendant no longer owes him any duty; sometimes, that the duty becomes one of imperfect obligation, and is not recognized in law. In one form or another, the doctrine is given effect, as showing that in a case to which it applies there is either no negligence towards the plaintiff on the part of the defendant, or want of due care on the part of the plaintiff. * * * Therefore, when it appears that a plaintiff has knowingly and voluntarily assumed the risk of an accident, the jury should be instructed that he cannot recover, and should not be permitted to consider the conduct of the defendant by itself, and find that it was negligent, and then consider the plaintiff's conduct by itself, and find that it was reasonably careful."

In Mundle v. Manufacturing Co., 86 Me. 400, 403, 30 Atl. 16, it was said:

"But in addition to what we have already stated in reference to the power of the servant to waive, or even dispense with, the obligation which the employer is under to him, the decisions of our own court, as well as elsewhere, hold that a plaintiff may be precluded from recovering when he voluntarily assumes a risk which he knows and appreciates, whether existing at the time he enters the service, or coming into existence afterwards. It is in this class of cases that the principle expressed by the maxim, 'Volenti non fit injuria,' has the effect to debar the plaintiff from a remedy which might otherwise be open to him. * * * It would not be just for one who has voluntarily assumed a known risk, or such as might be discovered by the exercise of ordinary care on his part, and for which another might be culpably responsible, to hold that other responsible in damages for the consequences of his own exposure to those risks which were known and understood by him."

The following authorities all announce the same doctrine,—some of them, under circumstances quite similar to those of the case at bar: Judkins v. Railroad Co., 80 Me. 418, 14 Atl. 735; Sullivan v. Manufacturing Co., 113 Mass. 396; Leary v. Railroad Co., 139 Mass. 580, 2 N. E. 115; Crown v. Orr, 140 N. Y. 450, 35 N. E. 648; Sweeney

v. Railroad Co., 57 Cal. 15; Tuttle v. Railroad Co., 122 U. S. 189, 7 Sup. Ct. 1166.

The doctrine of an assumption of risk by the employé does not detract from, or lessen in the least, the duty of the employer towards the former to supply and maintain suitable and safe instrumentalities, and a reasonably safe place, for the performance by the employé of the work required of him, since it imports, as an inseparable prerequisite, complete knowledge and understanding on the part of the employé of the risk or danger, and an intelligent and full consent, express or implied, to abide by the consequences. In this case, whatever was the increased hazard in going out on the running board while the engine was in motion, the conclusion is inevitable that Johnson, who was a man of intelligence and experience, knew and appreciated it; and, that being so, he must be deemed to have acted accordingly, and to have assumed the incidental risk or peril.

In this view of the evidence in this case, it is not necessary to notice the other errors assigned in the bill of exceptions. We think, upon the evidence as presented in the record, the judge should have instructed the jury to find a verdict for the defendant. The judgment of the circuit court is therefore reversed, and the case remanded for a new trial.

McKENNA, Circuit Judge, concurs in the judgment.